872 P.2d 870

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Thomas E. SANDERS, Defendant– Appellant.**

**No. 20334.**

Supreme Court of New Mexico.

April 6, 1994.

454

Sammy J. Quintana, Chief Public Defender, Amme M. Hogan, Asst. Appellate Defender, Santa Fe, for defendant-appellant.

Tom Udall, Atty. Gen., Anthony Tupler, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

MONTGOMERY, Chief Justice.

Defendant–Appellant Thomas E. Sanders appeals his convictions of first degree murder, conspiracy to commit first degree murder, tampering with evidence, conspiracy to commit tampering with evidence, attempted fraud greater than $20,000, conspiracy to commit fraud greater than $20,000, fraud greater than $2,500, and conspiracy to commit fraud greater than $2,500. We affirm.

## I. FACTS

The evidence presented to the jury in Sanders' trial, viewed in the light most favorable to support the verdicts, *see State v.*

*Sutphin,* 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988), established the following facts: Sanders met Mrs. Christine Torres ("Christine"), wife of Robert Torres ("Robert"), in May 1988. Sanders and Christine became friendly and soon entered into an intimate relationship. During the course of their relationship, Sanders and Christine developed an interest in opening a nightclub together in Albuquerque.

In February 1990, Christine was caught embezzling about $21,000 from her employer, the University of New Mexico ("UNM"). She was fired from her job and turned over to the authorities. One week after being fired, Christine met with Sanders and explained her predicament, eventually telling him, "There won't be a nightclub." Sanders became angry and punched a wall after hearing this news, but then told Christine not to worry—that it "would be all right."

Two months later, Sanders called Christine and asked her to meet him in the parking lot of the Food Emporium at Coors Road and Central Avenue. When Christine arrived, Sanders got into her car and told her that he had a plan to help her pay her bills. He suggested that they burglarize her house and file an insurance claim for the "loss." He then asked her if her husband, Robert, had life insurance. When she responded affirmatively, Sanders said, "Well, kill Robert." Christine told him that she would have to think about it.

Over the next few weeks, Sanders called Christine two or three times to ask her if she had thought about what they had talked about that night, and she would tell him that she was "still thinking about it." On May 12, Robert and Christine attended a wedding, where they got into a horrendous fight. During the fight Robert made remarks to Christine that she found humiliating and degrading and that made her furious. The following day she called Sanders and told him that she wanted her husband killed. Sanders and Christine then met several times to plan to kill Robert and to defraud his insurance company.

They decided to murder Robert on May 24, the Torreses' fourth wedding anniversary. At around 3:00 p.m. on May 24, Sanders and Christine met in the parking lot of St. Joseph's Northeast Heights Hospital and then followed one another in their cars to Coronado Center ("Coronado"). Sanders left his car at Coronado and the two of them drove to the Torres residence in Christine's car. Once they arrived at Christine's house, they loaded her car with televisions, guns, stereo equipment, a VCR, a microwave, a camcorder, and jewelry. They then proceeded to ransack the house to make it appear that a burglary had taken place.

Sanders and Christine drove to Sanders' house and unloaded the items taken from the Torres residence and then returned to that residence, where Sanders got out of the car to lay in wait for Robert. While Christine went to pick up her children and take them to softball practice, Sanders went into her house and armed himself with a .270 caliber rifle belonging to Robert. When Robert came home at around 5:00 p.m., he entered the house and walked down the hallway toward the dining room, whereupon Sanders shot him in the back. After shooting Robert, Sanders picked up a box of roses Robert had brought home as an anniversary gift for Christine, took Robert's car keys and drove Robert's car to Coronado, and retrieved his own car. Sanders then drove home and gave the roses to his wife.

Following her husband's murder, Christine made an insurance claim on her mother's homeowner's policy for the items lost in the "burglary" and was compensated by the insurance company. She gave the money received to Sanders. She also made a claim for the proceeds under her husband's life insurance policy, but never received this money.

Sanders and Christine were indicted in November 1990 for the murder of Robert Torres, tampering with evidence, attempt to commit fraud, fraud, and four counts of conspiracy. Shortly before the scheduled trial in August 1991, Christine entered into a plea agreement with the State that contemplated her giving testimony against Sanders in exchange for a reduced sentence. Christine testified at Sanders' trial and detailed for the jury the planning and significant acts resulting in Robert's death, as well as Sanders' and

her own efforts to conceal their involvement in the crime while sharing the insurance proceeds. The jury found Sanders guilty of each of the eight felony charges against him, including first degree, deliberate-intent murder, and he was sentenced to life imprisonment plus twenty-two and one-half years. Sanders appeals these convictions under Article VI, Section 2, of the New Mexico Constitution (providing for direct review in Supreme Court of conviction where sentence of life imprisonment is imposed).

On appeal, Sanders raises the following issues (among others): (1) that the evidence was insufficient to support his convictions for first degree murder, tampering with evidence, fraud, and attempt to commit fraud; (2) that the evidence was insufficient to support more than one conspiracy conviction; (3) that the trial court erred in refusing to admit the entirety of Sanders' statement to the police into evidence; and (4) that the court erred in not allowing any cross-examination concerning a polygraph examination taken by Christine. We discuss these issues in the following sections of this opinion.

## II. DISCUSSION

### A. Sufficiency of the Evidence
#### 1. Standard of Review

■ Sanders argues that there is insufficient evidence in the record to support his convictions. When evaluating the sufficiency of evidence to support a conviction, we view the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences to uphold a verdict of conviction. See, e.g., State v. Garcia, 114 N.M. 269, 273, 837 P.2d 862, 866 (1992); State v. Lankford, 92 N.M. 1, 2, 582 P.2d 378, 379 (1978). Sanders suggests that this standard of review was changed by our opinion in Garcia, but we clarify today (if clarification is necessary) that the standard of review of sufficiency of the evidence to support a criminal conviction was not modified or altered in any way by Garcia. See State v. Orgain, 115 N.M. 123, 126, 847 P.2d 1377, 1380 (Ct.App.), cert. denied, 115 N.M. 145, 848 P.2d 531 (1993). The Court of Appeals was correct in Orgain "that Garcia

merely reiterated the established law that the standard must be viewed in the context of the state's burden below—to prove each element of the crime beyond a reasonable doubt." Id. The reviewing court engages in a two-step process: First it reviews the evidence under the Sutphin/Lankford standard with deference to the findings of the trial court; then it determines whether the evidence, viewed in this manner, could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt. Id.; Garcia, 114 N.M. at 274, 837 P.2d at 867.

■ We did emphasize in Garcia the requirement that the evidence be such as to enable a rational jury to find the defendant's guilt beyond a reasonable doubt with respect to every element essential to a conviction—a requirement that, we noted, had sometimes been omitted in this Court's (including Lankford's) and the Court of Appeals' reiterations of the substantial-evidence standard of review. 114 N.M. at 273–74 & n. 8, 837 P.2d at 866–67 & n. 8. We also stressed the reviewing court's duty, recognized in Sutphin, to scrutinize the evidence to ensure that "a rational jury could have found beyond a reasonable doubt the essential facts required for a conviction." Id. at 274, 837 P.2d at 867. But these requirements were nothing new; they had been established, as a matter of constitutional law, for well over a decade at least. See id. (citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).

#### 2. Murder, Fraud, Attempt to Commit Fraud, and Tampering with Evidence Convictions

■ Sanders claims that Christine's testimony concerning his motive for murdering Robert, committing insurance fraud, and tampering with evidence was so implausible that no rational jury could have believed it and that, accordingly, his convictions should be reversed. Sanders in effect asks this Court to disregard Christine's testimony that Sanders' motive for killing Robert was to obtain insurance proceeds to start a nightclub and to compensate UNM for the money

Christine had embezzled. We do not, however, substitute our judgment for that of the factfinder concerning the credibility of witnesses or the weight to be given their testimony. *State v. Riggs,* 114 N.M. 358, 362–63, 838 P.2d 975, 979–80 (1992). Testimony by a witness whom the factfinder has believed may be rejected by an appellate court only if there is a physical impossibility that the statements are true or the falsity of the statement is apparent without resort to inferences or deductions. *State v. Till,* 78 N.M. 255, 256, 430 P.2d 752, 753 (1967), *cert. denied,* 390 U.S. 713, 88 S.Ct. 1426, 20 L.Ed.2d 254 (1968). Because Christine's testimony is not inherently improbable under this standard, we must give her testimony the weight, and attach to it the credibility, apparently assigned it by the jury.

■ Christine testified that she and Sanders agreed to murder her husband; that they intended to use the insurance proceeds to open a nightclub and to solve her other money problems; that they agreed to take items from her house to make it appear that Robert had been killed interrupting a burglary in progress; and that they drove together to the Torres residence on the date of the murder, where they ransacked the house and took valuable items from the premises. She also testified that she saw Sanders loading a hunting rifle after ransacking the residence; that they then drove to Sanders' house and unloaded the items taken from the residence; that she then dropped Sanders off at the residence so that he could kill Robert; and that, several days after her husband's murder, Sanders told her that he had pointed the gun at Robert and had shot him. She continued that the shot was very loud and that Sanders made sure that Robert was dead before he left the Torres residence; that they shared the proceeds from an insurance claim on the items taken in the "burglary"; and that they intended to share the proceeds from the claim on Robert's life insurance. We have considered this testimony, along with other evidence in the record, and hold that there is substantial evidence to support the guilty verdicts beyond a reasonable doubt with respect to every element essential for a conviction. *See* NMSA 1978, §§ 30–2–1(A)(1), 30–16–6, 30–22–5, 30–28–1 (Repl.

Pamp.1984 & Cum.Supp.1993) (prescribing elements for, respectively, first degree murder (willful and deliberate), fraud, tampering with evidence, attempt to commit a felony (fraud)).

### 3. Conspiracy Convictions

Sanders argues that there was no evidence of more than one conspiracy because the evidence only showed one motive—to get money to open a nightclub—to commit the predicate crimes for which he was convicted. Because there was only one motive, he contends, there was only one agreement and, therefore, only one conspiracy.

■ The standard for determining whether one who has conspired to commit a number of crimes is guilty of one or more conspiracies was established in *State v. Ross,* 86 N.M. 212, 214–15, 521 P.2d 1161, 1163–64 (Ct.App.1974). In *Ross,* our Court of Appeals held that the number of agreements is the focus for determining the number of conspiracies: Where there is one agreement to commit two or more criminal acts, the perpetrators are guilty of a single conspiracy. Because the conspiracy statute, NMSA 1978, Section 30–28–2 (Repl.Pamp.1984), criminalizes the agreement constituting the conspiracy, *State v. Gilbert,* 98 N.M. 77, 81, 644 P.2d 1066, 1070 (Ct.App.1982), the number of agreements to break the law determines the number of criminal conspiracies subject to prosecution. We review the question whether there was one agreement or several under the sufficiency-of-evidence standard set out above. *See State v. Hernandez,* 104 N.M. 268, 278, 720 P.2d 303, 313 (Ct.App.) (stating that determination of number of conspiracies is fact question for jury; jury findings reviewed under sufficiency-of-evidence principles), *cert. denied,* 104 N.M. 201, 718 P.2d 1349 (1986).

Christine's testimony provided evidence that: (1) she met with Sanders in late April or early May 1990 about 9 p.m. in a grocery store parking lot and agreed to simulate a burglary on her house to obtain money from the insurance company to help pay her bills (agreement to commit fraud greater than $2,500); (2) she called Sanders later, and

they then agreed to murder her husband (agreement to commit first degree murder); (3) she met with Sanders several times thereafter to plan the crime, and during those meetings they agreed to ransack the house to make it appear that Robert had been murdered by a burglar (agreement to commit tampering with evidence); and (4) during the course of the planning meetings they agreed to make a claim on Robert's life insurance and use the money to reimburse UNM for Christine's embezzlement, with any remaining funds to be used to finance a nightclub (agreement to commit fraud greater than $20,000). We hold that this was sufficient evidence for the jury to find beyond a reasonable doubt the existence of four separate agreements. *See State v. Johnston,* 98 N.M. 92, 95, 645 P.2d 448, 451 (Ct.App.) (proof of agreement sufficient to support conspiracy conviction may be derived from circumstantial evidence and reasonable inferences therefrom), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982).

### B. *Admissibility of Sanders' Statement to Police*

■ The police interrogated Sanders on November 30, 1990, during their investigation of the Robert Torres homicide. Sanders argues that the court erred, under the doctrine of completeness, when it refused to admit into evidence his entire statement to the police. At trial, the prosecution asked Sanders two questions about his prior statement: First, whether he had lied to the police when he denied having a sexual relationship with Christine; second, whether he had told the police that he did not know where he had been the day Robert was killed. Based on these two questions, Sanders asserted the right under SCRA 1986, 11–106 ("Rule 106"), to introduce the entire statement into evidence so as to put his answers in context.

Rule 106 provides:

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

"The purpose of Rule 106 is to permit the introduction of recorded statements that place in context other writings admitted into evidence which, viewed alone, may be misleading." *State v. Carr,* 95 N.M. 755, 767, 626 P.2d 292, 304 (Ct.App.), *cert. denied,* 95 N.M. 669, 625 P.2d 1186, *cert. denied,* 454 U.S. 853, 102 S.Ct. 298, 70 L.Ed.2d 145 (1981). The rule applies only to other parts of a document that are relevant and that illuminate the parts of the document already admitted. *State v. Case,* 103 N.M. 574, 577, 711 P.2d 19, 22 (Ct.App.), *rev'd on other grounds,* 103 N.M. 501, 709 P.2d 670 (1985).

■ Sanders requested that the court admit his 22–page statement in its entirety. The last six pages of the statement are limited to a discussion by the two officers interrogating Sanders, during which Sanders only speaks a few words. This portion of the statement clearly has no relevance to Sanders' statements that he had never had a sexual relationship with Christine and that he could not recall his whereabouts on the day of the murder. There is no rule that either the entire document or none of it must be admitted under Rule 106. *Carr,* 95 N.M. at 767, 626 P.2d at 304. Because Sanders made no showing that the entire document was relevant to the jury's understanding of his statements, the court did not abuse its discretion in refusing to admit it under Rule 106. *See Case,* 103 N.M. at 577, 711 P.2d at 22 (defendant's failure to show relevancy of refused portions of document justified court's exclusion under Rule 106).

### C. *Admissibility of Christine's Polygraph Examination*

■ Prior to Christine's testimony at trial, the State made a motion in limine to prohibit Sanders from making any inquiries into a purported polygraph examination administered to Christine on behalf of her defense counsel. Sanders objected to the motion and requested that the court allow him to cross-examine Christine about whether she had taken a polygraph examination, what questions she had been asked and what she had answered, and whether she had passed

the examination. The trial court granted the motion in limine and refused to allow inquiry into the polygraph examination during Christine's testimony. Sanders contends that the trial court's restriction on his cross-examination of Christine deprived him of his rights to confront an adverse witness and to present a defense.

The Confrontation Clause of the Sixth Amendment to the United States Constitution and Article II, Section 14, of the New Mexico Constitution guarantee a defendant in a criminal prosecution the right to confront the witnesses against him. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974); *State v. Fairweather*, 116 N.M. 456, 462, 863 P.2d 1077, 1083 (1993). The most important element of the right of confrontation is the right of cross-examination. *In re Troy P.*, 114 N.M. 525, 529, 842 P.2d 742, 746 (Ct.App. 1992); *see also Davis*, 415 U.S. at 315–16, 94 S.Ct. at 1110 (" 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " (quoting 5 John H. Wigmore, *Evidence* § 1395, at 123 (3d ed. 1940))). Cross-examination of adverse witnesses is the primary means for testing their truth and credibility and is essential to insure the integrity of the fact-finding process. *State v. Lancaster*, 116 N.M. 41, 43, 859 P.2d 1068, 1070 (Ct.App.1993).

Nevertheless, the right of cross-examination of adverse witnesses is not absolute. The trial court "retain[s] wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986). The Confrontation Clause merely guarantees an opportunity for effective cross-examination; it does not guarantee that the defense may cross-examine a witness "in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam).

In New Mexico, the trial court has discretion to admit results of polygraph tests into evidence if certain conditions, designed to ensure the accuracy and reliability of the test results, are met. *See* SCRA 1986, 11–707; *Tafoya v. Baca*, 103 N.M. 56, 60, 702 P.2d 1001, 1005 (1985); *State v. Anthony*, 100 N.M. 735, 737–39, 676 P.2d 262, 264–66 (Ct. App.1983). The proponent of the polygraph evidence must show that: the polygraph examiner was licensed, NMSA 1978, §§ 61–27A–1 to –20 (Repl.Pamp.1993); the examiner is qualified as an expert witness, SCRA 11–707(C); the examinee was a proper subject for testing, SCRA 11–707(C); the test was conducted under proper conditions, SCRA 11–707(C); both the pretest interview and examination were recorded, SCRA 11–707(E); and the examiner was qualified to properly evaluate the fitness of the subject, *Anthony*, 100 N.M. at 739, 676 P.2d at 266. Any party intending to use polygraph test evidence must also give written notice to the other party of his or her intention at least ten days before trial. SCRA 11–707(D). Sanders met none of these requirements.

Because Sanders failed to lay the proper foundation for admission of the results of the polygraph test, testimony concerning the outcome of that test was incompetent as a matter of law. *See Anthony*, 100 N.M. at 739, 676 P.2d at 266 (holding that polygraph evidence is inadmissible if standards of SCRA 11–707 are not met). The trial court did not violate Sanders' right of confrontation by refusing to admit polygraph evidence of unproven reliability. *See United States v. A & S Council Oil Co.*, 947 F.2d 1128, 1133–34 (4th Cir.1991) (no Confrontation Clause violation where court limited cross-examination of government witness regarding polygraph results); *State v. Losee*, 354 N.W.2d 239, 242 (Iowa 1984) (same); *State v. Ellison*, 36 Wash.App. 564, 676 P.2d 531, 535 (same), *review denied*, 101 Wash.2d 1010 (1984).

We also hold that trial court acted properly in refusing to allow cross-examination concerning whether Christine had taken a polygraph test, what questions were asked in the test, and what answers were given. A defendant's right to present evi-

dence on his own behalf is subject to his compliance with "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). Our Rules of Evidence allow the trial court discretion to limit cross-examination in the interest of insuring a fair and efficient trial. SCRA 11–611(A); *Sanchez v. State,* 103 N.M. 25, 27, 702 P.2d 345, 347 (1985). The Rules of Evidence also permit the court to exclude otherwise relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." SCRA 11–403. The court's discretion, however, is subject to allowing the defendant a threshold level of inquiry required by the Constitution. *United States v. Lynn,* 856 F.2d 430, 433 (1st Cir.1988). To meet this threshold, the court must ensure that the jury receives adequate information to make a discriminating appraisal of the bias and motives of a witness. *Id.; see also Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1435–36 (test for Confrontation Clause violation is whether reasonable jury might have received significantly different impression of the witness's credibility had counsel pursued proposed line of cross-examination).

The trial court ruled that inquiry into whether a polygraph was taken would be far more misleading to the jury than probative and that inquiry into the content of the story Christine told her defense attorney would be cumulative because she had already admitted that she lied when she told that story to the police. We find no abuse of discretion in these rulings.

We agree that the jury might be confused by the bare mention of Christine's polygraph examination and speculate that, since the matter was raised by the defense, her testimony at trial was inconsistent with the results of the polygraph. Because the simple fact that she took a polygraph test in no way reflects on her bias or motives for testifying nor sheds light on her credibility, there was

no constitutional violation in excluding this evidence. *See Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1435–36; *Lynn,* 856 F.2d at 433; *see also People v. Renfrow,* 704 P.2d 876, 877 (Colo.Ct.App.1985) (finding no violation of right to confrontation where any reference to witness's refusal to take polygraph test was excluded).

We also agree that inquiry into the content of the polygraph examination (i.e., what questions were asked and what answers given) would be cumulative. Christine admitted in her direct testimony and under cross-examination that she initially had told the police that she had not been involved in the murder of her husband and that she had changed her story prior to trial. Sanders' offer of proof regarding the polygraph test indicates that Christine told her defense attorney the same story that she had initially told the police, which she later recanted. During his cross-examination of Christine, Sanders elicited testimony that she had given two statements to the police that were false and that, consistently with her testimony against Sanders, she would benefit from a plea agreement substantially reducing her potential jail time. The jury thus had sufficient information to make a discriminating appraisal of Christine's bias and motive for testifying. We find no error in the trial court's exclusion of evidence concerning the content of the polygraph exam. *See People v. Sully,* 53 Cal.3d 1195, 283 Cal.Rptr. 144, 159, 812 P.2d 163, 176–78 (1991) (in bank) (no constitutional violation in limiting cross-examination where defendant had adequate opportunity to challenge witness's credibility), *cert. denied,* —— U.S. ——, 112 S.Ct. 1494, 117 L.Ed.2d 634 (1992).

## III. CONCLUSION

Sanders also raises arguments that the jury improperly stacked inferences in reaching its verdict, that the court erred in making certain evidentiary rulings, that the State's charging pattern violated constitutional prohibitions against double jeopardy and guarantees of due process, that the State engaged in prosecutorial misconduct, that he was denied effective assistance of counsel, and that cumulative error requires reversal. We have

carefully considered these issues and find them without merit; consequently, we do not address them. Finding no error, we affirm the judgment below.

**IT IS SO ORDERED.**

RANSOM and FRANCHINI, JJ., concur.