2002-NMCA-100

53 P.3d 909

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Serafin TRUJILLO, Defendant–Appellant.**

No. 21,434.

Court of Appeals of New Mexico.

July 29, 2002.

Certiorari Denied, No. 27,645,
Sept. 4, 2002.

Patricia A. Madrid, Attorney General, Santa Fe, NM, M. Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Appellee.

Phyllis H. Subin, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

BOSSON, Chief Judge.

{1} Defendant Serafin Trujillo appeals from a conviction for child abuse by endangerment. We discuss the minimum evidence required to support such a conviction, when the record shows no evidence of physical danger to the child or a threat to the child's emotional health. We reverse Defendant's conviction for child abuse, but affirm the trial court in all other respects.

## BACKGROUND

{2} On June 1, 1998, a domestic dispute occurred between Defendant and his partner, Selena Maestas (Victim). Defendant and Victim had lived together for eleven years and have two daughters, who were eight- and three-years-old at the time. Defendant had been drinking throughout the day and arguing with Victim. Defendant left the home sometime during the afternoon and stayed away for several hours.

{3} When Defendant returned home that night, he awakened Victim by yelling at her and insulting her. Victim testified that Defendant entered their bedroom and began hitting her with the buckle end of a belt. She also testified that Defendant tried to strangle her with the belt, saying he was going to kill her and hide her body so that it would be an "unsolved mystery." Victim stated that Defendant attacked her on the bed, while she tried to protect herself beneath a blanket.

{4} The couple's eight-year-old daughter (Daughter), who had been asleep in her bedroom, was awakened by the commotion and got up to see what was happening. Daughter testified that she came to the bedroom door and saw her father hitting her mother while her mother was telling him to stop. Victim testified that Defendant had locked the bedroom door and that Defendant got up

to open the door when he heard Daughter trying to get in.

{5} Defendant ordered Daughter to go back to her own room saying, "Get your little f—ing ass back to bed because I don't want to have you see me kill your mother." Victim also told Daughter to go back to bed. Daughter returned to her bedroom, where she remained while Defendant continued his attack on Victim. Victim was eventually able to distract Defendant, escape through a window, and call the police from a nearby trailer. Defendant chased after Victim, but disappeared before the police arrived.

{6} The police and Defendant's aunt went to pick up the children who, according to the aunt, were asleep in bed. Victim testified that Defendant's brother was passed out drunk in the living room throughout the incident. A police officer took Victim to the emergency room because of a bruise on her elbow. She was examined, given pain medication, and taken to a hotel room. The police arrested Defendant at his workplace the following morning.

{7} With respect to crimes against Victim, Defendant was charged with assault with intent to commit a violent felony on a household member, false imprisonment, and aggravated battery. He was also charged with abuse of a child, arising from the presence of both of his daughters during the domestic violence incident. After a jury trial, Defendant was convicted of false imprisonment and misdemeanor aggravated battery, a lesser included offense of assault with intent to commit a violent felony on a household member. He was also convicted of one count of child abuse, under a theory of endangerment, related to Daughter being present during his attack on Victim. The jury acquitted Defendant of child abuse in connection with the younger daughter, who apparently slept throughout the incident. The trial court sentenced Defendant, an habitual offender, to a term of 6 years and 179 days.

## DISCUSSION

### Sufficiency of the Evidence to Support a Conviction for Child Abuse

{8} In analyzing sufficiency of the evidence issues, our inquiry is whether substantial evidence exists of either a direct or circumstantial nature to support a verdict of guilty beyond a reasonable doubt with respect to each essential element of a crime charged. *See State v. Apodaca,* 118 N.M. 762, 765–66, 887 P.2d 756, 759–60 (1994); *State v. Duran,* 107 N.M. 603, 605, 762 P.2d 890, 892 (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Salgado,* 1999–NMSC–008, ¶ 25, 126 N.M. 691, 974 P.2d 661 (internal quotation marks and citation omitted). The question is whether the trial court's result is supported by substantial evidence, not whether the trial court could have reached a different conclusion. *See In re Ernesto M., Jr.,* 1996–NMCA–039, ¶ 15, 121 N.M. 562, 915 P.2d 318.

{9} NMSA 1978, Section 30–6–1(D) (2001), provides in relevant part:

Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be:

(1) placed in a situation that may endanger the child's life or health;

(2) tortured, cruelly confined or cruelly punished.

When abuse of a child does not result in death or great bodily harm, a first offense is a third degree felony. *See id.*

{10} Initially, the State sought to charge Defendant under both an endangerment theory, pursuant to Section 30–6–1(D)(1), and a theory of cruel punishment, under Section 30–6–1(D)(2). However, following Defendant's motion for a directed verdict on the child abuse charges, the State was not allowed to continue under the cruel punishment theory. Accordingly, the jury was instructed only on the endangerment theory. The jury instructions provided that, to find Defendant guilty of abuse of a child, it must decide that "Defendant intentionally and without justification caused [Daughter] to be placed in a situation which endangered the life or health of [Daughter]." Defendant challenges the sufficiency of the evidence for the jury to find that he caused Daughter to be placed in a situation "which endangered" her life or health.

{11} Daughter testified that when she witnessed Defendant's attack on Victim, it made her feel "sad" and made her feel scared that her "dad [would] kill [her] mom." Daughter also thought that she might "get taken away," a statement she was unable to explain, but that may have been related to the family having had contact with CYFD and Family Preservation Services following the domestic violence incident. Daughter also testified that she thought Defendant might hit her too. When she did as she was ordered and returned to her bedroom, she testified that she was unable to go back to sleep.

{12} The State argues that Defendant's violent, out-of-control behavior created a risk that Daughter might encounter physical harm, and the State also argues that Defendant's behavior endangered Daughter's emotional health. Victim testified that, when Daughter came to the bedroom door, Victim knew Daughter was scared because she "could see it in her eyes." After the incident, Daughter "[did] not want to leave [Victim's] side." According to Victim, Daughter was "afraid that something might happen to [Victim] while she [was] at school." As a result, Daughter missed "a lot of days of school" in the aftermath of the incident, although she had resumed attending school before the time of trial. The State, in its answer brief, also argues that Daughter was endangered when Defendant caused Victim to flee the house and ran after her, leaving the children unattended except for the presence of Defendant's brother who was passed out on the couch.

{13} In *State v. Ungarten*, 115 N.M. 607, 608–09, 856 P.2d 569, 570–71 (Ct.App.1993), we found substantial evidence to support a conviction for child abuse by endangerment, despite the fact that the child was not physically injured or touched. In that case, the accused brandished a knife in the direction of the child and the child's father. *Id.* at 608, 856 P.2d at 570. The child, who was standing beside his father at the beginning of the altercation, testified that he could not tell whether the knife thrusts were directed at him or his father. *See id.* at 610, 856 P.2d at 572. Significantly, the child also testified

that at one point the knife came close to his body. *See id.* at 608, 856 P.2d at 570.

{14} Notably, in examining the relevant statutory language, we stated that

[t]he term 'may,' as used in [Section 30–6–1(D)(1) ], does not connote a mere possibility, however remote, that harm may result from Defendant's acts.... [T]he legislature intended the phrase 'may endanger' to convey a more restrictive meaning in child abuse cases, i.e., 'a reasonable probability or possibility' that the child will be endangered.

*Ungarten,* 115 N.M. at 609, 856 P.2d at 571. We also noted that "[p]roof of criminal intent is not required to establish the crime of child abuse." *Id.* (stating that child abuse statute has been characterized as a strict liability statute). Rather, the question is one of whether the defendant's conduct caused the child to be exposed to a significant risk of harm.

{15} In a similar case, our Supreme Court upheld a conviction for negligently caused child abuse even though the child was not physically harmed. *See State v. McGruder,* 1997–NMSC–023, ¶¶ 37–38, 123 N.M. 302, 940 P.2d 150. The defendant in *McGruder,* after shooting and killing another occupant of the apartment, pointed a gun at the child's mother while the child was standing behind her, and threatened to kill the mother if she did not surrender the keys to her truck. *Id.* ¶ 38. The Supreme Court utilized the *Ungarten* standard of "a reasonable probability or possibility" of endangerment. *McGruder,* 1997–NMSC–023, ¶ 37, 123 N.M. 302, 940 P.2d 150 (internal quotation marks and citation omitted); *accord Ungarten,* 115 N.M. at 609, 856 P.2d at 571.

{16} In both *McGruder* and *Ungarten,* the children were situated directly in the line of physical danger from a lethal weapon, which was pointed in their direction during a heated exchange. We find it significant that both these cases presented a significant risk of articulable harm, whether or not it actually occurred.

{17} This Court recently upheld a conviction for criminally negligent child abuse when the accused drove in an intoxicated

condition with her children in the car, and was observed driving on the wrong side of a divided highway. *See State v. Castaneda,* 2001–NMCA–052, ¶¶ 21–22, 130 N.M. 679, 30 P.3d 368. Those facts supported a finding that the defendant acted with reckless disregard for the safety of her children by placing them in a situation "that *may* cause harm." *Id.* ¶ 17; *see also id.* ¶¶ 20–22 (citing statutory language). As with *McGruder* and *Ungarten,* the children were placed directly in the line of physical danger, which in that case was in a car with an inebriated driver facing oncoming traffic.

{18} In contrast with this line of cases affirming child abuse convictions, in *State v. Roybal,* 115 N.M. 27, 34, 846 P.2d 333, 340 (Ct.App.1992), we determined that mere proximity to a dangerous situation was insufficient to support a conviction for child abuse by endangerment. *See also Ungarten,* 115 N.M. at 609, 856 P.2d at 571 (describing *Roybal* and stating that "mere proximity" to a drug transaction was insufficient to constitute child endangerment). In *Roybal,* the defendant left his wife and child in a car, approximately ten or fifteen feet away, while he bought heroin. *See Roybal,* 115 N.M. at 34, 846 P.2d at 340. When police officers arrived on the scene, one of the co-defendants resisted arrest. *Id.* Although the drug transaction could well have resulted in violence, we concluded that there was insufficient evidence that the child "was in fact placed in danger." *Id.*

{19} In the case before us, Daughter testified as to her subjective fear that Defendant might hit her. However, Defendant's attack was clearly directed at Victim, not Child, and Defendant was appropriately convicted for his crimes against Victim. Defendant did not threaten Daughter or indicate any intention to harm Daughter. Nor does the evidence show that Daughter came within range of Defendant's blows or the belt that he used in the attack. Daughter was never placed in the line of physical danger in the same sense as the children in *McGruder, Ungarten,* and *Castaneda.* In fact, Defendant made Daughter leave the room, placing her outside the direct line of danger, so that he could continue his assault on Victim.

{20} We recognize that there may be instances when the risk of emotional harm from a similar incident might be sufficient to support a conviction based on endangerment. In theory, the State might lay an adequate evidentiary foundation proving the likelihood of harm to a child's emotional health as a result of witnessing such an attack on her mother. We do not wish to foreclose such an evidentiary showing in the future. However, the State presented no such evidence in this case. The State also presented no evidence that Daughter was endangered merely by being left alone with Defendant's brother, unconscious on the couch. *See State v. Allen,* 140 Ohio App.3d 322, 747 N.E.2d 315 (2000) (reversing a child endangerment conviction for leaving a seven-year-old child unattended while parent went to borrow butter). Accordingly, we determine that there was insufficient evidence of "a reasonable probability or possibility" that Daughter's emotional or physical health was endangered. *Ungarten,* 115 N.M. at 609, 856 P.2d at 571 (internal quotation marks and citation omitted).

{21} In making this offense a third degree felony, the legislature intended to address conduct with potentially serious consequences to the life or health of a child. The coupling in the statute of the word "health" with the word "life" suggests to us that the legislature intended to address situations in which children are exposed to a substantial risk to their health. *See* § 30–6–1(D)(1) (criminalizing conduct where a child is "placed in a situation that may endanger the child's *life or health*" (emphasis added)); *see also Santillanes v. State,* 115 N.M. 215, 221, 849 P.2d 358, 364 (1993) (stating that statutes defining criminal conduct must be strictly construed).

{22} We also note that the legislature has created a civil process whereby, through abuse and neglect proceedings, the interests of children may be protected, regardless of whether the threatened danger meets the higher threshold required for a criminal conviction. *See generally* Children's Code, Child Abuse and Neglect, NMSA 1978, Chapter 32[32A], Article 4 (2001). The evidence presented by the State in this case, as related to Defendant's conduct toward Daughter, fits a

pattern typically addressed in civil proceedings under the Children's Code.

## The Court Did Not Commit Fundamental Error

{23} Before Defendant left the premises on the afternoon of the domestic violence incident, he became angry and threw two kittens belonging to Daughter, causing one kitten to hit the fence and the other to land on the roadway (hereafter "kittens incident"). Both kittens were apparently dazed, but alive. Victim and Daughter witnessed this event. Defendant contends that the trial court erred in allowing the jury to hear about the kittens incident. Defendant, who did not object to this testimony below, is relegated to a claim of fundamental error.

{24} The doctrine of fundamental error allows an appellate court to review a criminal conviction for errors that would undermine judicial integrity if left unchecked. *State v. Traeger*, 2001–NMSC–022, ¶ 18, 130 N.M. 618, 29 P.3d 518. This Court should "exercise this discretion very guardedly, and only where some fundamental right has been invaded." *Id.* (internal quotation marks and citations omitted). The application of this doctrine is reserved " 'for the protection of those whose innocence appears indisputably, or open to such question that it would shock the conscience to [allow] the conviction to stand.' " *Cunningham*, 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (quoting *State v. Rodriguez*, 81 N.M. 503, 505, 469 P.2d 148, 150 (1970)).

{25} The State, with no objection from Defendant, introduced testimony regarding the kittens incident, which occurred several hours before Defendant's attack on Victim. Daughter was allowed to testify that she saw Defendant throw her kittens and that this made her cry. Victim also testified that she saw Defendant throw the kittens, one at a time, and that one of them was "like half dead" and both were "like dizzy." The State also had Victim perform a re-enactment by throwing two toy "Beanie Babies." The kittens incident was mentioned in both the State's opening and closing arguments.

{26} Defendant characterizes the kittens incident testimony as inappropriate evidence of uncharged bad acts, which under Rule 11–404 NMRA 2002 was improperly used to show his character or propensity for violence. Defendant argues that the kittens incident was prejudicial, unrelated to the crimes charged, and it deprived him of a fair trial. Defendant contends that the kittens incident testimony was galvanizing, because there was very little physical evidence corroborating any of the charges.

{27} We do not agree. Aside from the child abuse charge discussed above, the State's case was strong as to the other crimes for which Defendant was convicted. Victim's testimony regarding the attack was corroborated by Daughter, Defendant's aunt, the police officer, and photographs of her injured elbow. Victim's testimony was further corroborated by incriminating letters Defendant wrote Victim from jail, in which he admitted his attack on Victim, said he was sorry, asked her to marry him, and urged her to change her story to get him out of trouble. Defendant fails to convince us that the kittens incident evidence, even if erroneously admitted, was unfairly prejudicial with respect to his convictions of the other crimes for which there was substantial, probative evidence.

{28} Moreover, the evidence may not have been erroneously admitted. The record shows that the kittens incident testimony was admitted, not to prove character or propensity for violence, but to support the State's theory, then at issue under Section 30–6–1(D)(2), that Defendant's actions had subjected Daughter to cruel punishment. The court subsequently dismissed that theory in response to Defendant's motion for directed verdict, but arguably the evidence was relevant at the time it was offered. The kittens incident was mentioned again, without objection from Defendant, in the State's closing argument to illustrate "what kind of rage [Defendant] began this attack with."

{29} In support of his argument that he was prejudiced by the kittens incident testimony, Defendant emphasizes a question sent out by the jury during its deliberations. The jury asked, "Is abusing an animal in front of

the child legally considered child abuse? Especially when it is the child's pet." In response, the court directed the jury to refer to the jury instructions, which provided a legal definition of the crime of child abuse, and instructed the jury that it might "consider all evidence received in court" to determine if the State had met its burden.

{30} Defendant appears to argue that the kittens incident evidence was prejudicial primarily in terms of his conviction for child abuse; that evidence of his abuse of the animal might have been confused by the jury as evidence of abuse of the child. Defendant has a point, which might be well-taken in the context of possible error in the child abuse conviction. However, we need not decide the question at this time because, as previously stated, we are reversing Defendant's child abuse conviction on other grounds.

{31} Thus, we need only determine whether admission of the kittens incident testimony invaded some fundamental right of Defendant relating to his other convictions. *See Cunningham*, 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176. To the contrary, our review of the record leads us to conclude that the State presented substantial evidence to support the other charges against Defendant, such that those convictions do not "undermine judicial integrity." *Id.* The admission of the kittens incident testimony, if erroneous at all, does not rise to the level of fundamental error.

**Ineffective Assistance of Trial Counsel**

{32} Defendant raises several claims of error by trial counsel, which he asserts denied him effective assistance of counsel. To prove ineffective assistance of counsel, a defendant must (1) show that counsel's performance was deficient in that it " 'fell below an objective standard of reasonableness,' " *Lytle v. Jordan*, 2001–NMSC–016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), and (2) show that the defendant suffered prejudice in that there is " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' " *id.* ¶ 27 (quoting *Strickland*, 466 U.S.

at 694, 104 S.Ct. 2052). In applying this deferential standard, we must make "every effort . . . to eliminate the distorting effects of hindsight" and must "indulge a strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Under the United States Constitution, the Sixth Amendment demands reasonable competence; it does not guarantee an errorless defense. *State v. Orona*, 97 N.M. 232, 234, 638 P.2d 1077, 1079 (1982).

{33} Defendant's primary contention arises from the kittens incident testimony. He argues that trial counsel should have objected to testimony about the kittens incident or filed a motion in limine to exclude this highly prejudicial propensity evidence. We have already rejected Defendant's argument regarding error or prejudice from the admission of this evidence. Furthermore, in closing argument defense counsel used this testimony, and the emphasis the State placed upon it, to argue the general weakness of the State's case. Counsel used the kittens incident testimony to argue that the State was focusing on irrelevant information to cover up flaws in its case. Under the circumstances, we cannot say this was an unreasonable trial tactic as a matter of law. *See State v. Jacobs*, 2000–NMSC–026, ¶ 49, 129 N.M. 448, 10 P.3d 127 (recognizing decision to object or not is a matter of trial tactics that will not be second guessed on review where there is a rational strategy to explain the counselor's conduct); *see also Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (stating that a defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy).

{34} Defendant alleges that trial counsel did not adequately prepare for trial, did not timely prepare witness lists, and only interviewed one witness before trial. However, based on our review of the record, we observe that trial counsel appears to have been well acquainted with the facts of the case and appropriately cross-examined State witnesses on a number of substantive points.

{35} Defendant complains that trial counsel was not initially aware that police officers obtained a taped statement from Victim on the night of the incident. This taped statement was the subject of a defense discovery motion but had apparently been lost, although the court did not find that the State breached any discovery duty. Defendant also contends that trial counsel did not listen to the grand jury tape, which included testimony by Victim and the police officer. We note, however, that counsel did impeach Victim related to an inconsistency between her testimony at trial and her statements to the grand jury.

{36} Defendant makes similarly unproductive arguments about ineffective assistance of counsel which we decline to itemize in this opinion. To prove ineffective assistance of counsel, a defendant must show not only that counsel's performance was deficient; he must also show that he suffered prejudice as a result. *Strickland*, 466 U.S. at 688–94, 104 S.Ct. 2052. To demonstrate prejudice, a defendant must show that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. Even if trial counsel erred in some of the ways Defendant contends, Defendant has failed to identify how he was prejudiced by any of these perceived deficiencies, such that the result of the proceeding would have been different. *See id.*

{37} In evaluating whether the prejudice prong of the *Strickland* test has been met, we must also consider the strength of the State's case. *See Patterson v. LeMaster*, 2001–NMSC–013, ¶ 31, 130 N.M. 179, 21 P.3d 1032. Aside from the child abuse charge, which we reverse on other grounds, the State's case against Defendant was strong. Nonetheless, trial counsel attacked whatever weaknesses existed in the State's case, presented defense witnesses, and otherwise presented an adequate defense. Counsel had some significant success. The jury was persuaded to reduce the primary charge of aggravated assault against a household member, a third degree felony, to aggravated battery, a misdemeanor. The jury also acquitted Defendant of the child abuse charge related to the younger daughter. Consequently, Defendant has failed to show any material prejudice in this case.

## CONCLUSION

{38} We reverse Defendant's conviction for abuse of a child by endangerment. We affirm all other convictions. We remand for re-sentencing.

{39} **IT IS SO ORDERED.**

WE CONCUR: JAMES J. WECHSLER and MICHAEL D. BUSTAMANTE, Judges.