2005-NMCA-140

124 P.3d 1186

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Kevin JENSEN, Defendant–Appellant.**

**No. 24,905.**

Court of Appeals of New Mexico.

Oct. 18, 2005.

Certiorari Granted, No. 29,528,
Dec. 6, 2005.

648

Patricia A. Madrid, Attorney General, Santa Fe, NM, M. Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Judge.

{1} Defendant Kevin Jensen's house was filthy, filled with animal feces, and was stench-ridden. Rotten food was in the refrigerator. Daily, his fifteen-year-old neighbor, Robbie Stroup, came over to Defendant's filthy house, drank alcoholic beverages excessively, smoked cigarettes, and visited pornographic websites on Defendant's computer. Defendant was charged with two counts of contributing to the delinquency of a minor and one count of child abuse. Defendant was convicted on all three counts and appeals only his child abuse conviction. We reverse.

## BACKGROUND

{2} Chief Deputy Susan Encinias went to the home of Bernice and John Stroup, in Moriarty, New Mexico, on October 28, 2002, regarding a report that the Stroups' fifteen-year-old son Robbie was missing. Defendant and Jeremy Wetherill were there at the time, along with Ms. Stroup. Upon Encinias's request, she and two other deputies went with Defendant to Defendant's house, which was located about five houses from the Stroups' home. Prior to entering Defendant's residence, Defendant and Ben Wetherill, an eighteen-year-old friend of Robbie's, had to move several dogs from the house to the garage. Encinias testified as to the "totally horrible," "filthy," "nasty," and "terrible" conditions inside Defendant's residence. The chief deputy also testified to seeing what she believed was some type of rodent droppings virtually everywhere. Encinias described that when she opened a door to one of the bedrooms, an emu rushed up to her and surprised her just as she stepped in dog feces. Encinias also testified that the stench of Defendant's home "just blew your mind away."

{3} Defendant told Encinias that Robbie was at Defendant's house the prior day, October 27, 2002. That day, according to Defendant, Robbie and Ben cleaned out Defendant's van and also played on the computer. Defendant cooked Robbie some sausage. Defendant and Robbie then went to a haunted house in Albuquerque. They returned at about 8:30 p.m. and Defendant made Robbie a hamburger. Robbie played on the computer some more and then walked home around 10:00 p.m.

{4} On October 29, 2002, a deputy sheriff searched Defendant's house pursuant to a consent signed by Defendant. The deputy found the house with a lot of dog feces on the floor. The deputy seized Defendant's computer. An animal control officer who came to take the emu had to go outside twice to avoid vomiting from the smell. Encinias prepared a criminal complaint, listing charges of contributing to the delinquency of a minor and child abuse.

{5} Photographs of Defendant's home were taken on November 1, 2002, and used at trial. According to Encinias, the condition of Defendant's house had not changed in any substantial way since October 28. In the living room area, there were dog feces, what appeared to be dog vomit on the floor, rat and bird droppings in a cage, and a horren-

dous stench. In the kitchen there were dog feces and dog vomit. The entire kitchen area, including stove, dishwasher, sink, and counter top, was filthy; areas were littered with dirt and dust, papers, and bottles. A table where Robbie had frequently used a computer was covered with rat or mouse droppings. Black, rotten food was in the refrigerator next to some good hamburger meat. The dining room table was littered with papers, rat droppings, dirt, dust, and spider webs. The baseboards were filthy and looked as though dogs had urinated on them. The bathroom was filthy, too, with coke bottles and a filthy looking plastic soda pop jug with a yellowish orange liquid.

{6} Ben testified that at Defendant's expense, Defendant took him and Robbie to martial arts classes. Defendant would also take them to Albuquerque to restaurants and hobby shops. Ben and Robbie were at Defendant's home every day, but only while Defendant was also home. According to Ben, the house was "one big old pig sty" and Defendant did not clean up after his animals and left trash everywhere. Ben testified that Defendant's six dogs were inside most of the time, doing their "business" there, and that Defendant kept the emu in one of the bedrooms. Robbie spent most of the time in the kitchen and living room area because that was where the computer was located, although Robbie would use the bathroom and also went into the three bedrooms. Defendant cooked hamburgers for Ben and Robbie. Defendant provided beer and whiskey for Ben and Robbie most days through October. Ben would sometimes go with Defendant to a liquor store to buy alcoholic beverages. Ben observed Robbie drink too much and vomit on one of the dogs. Ben was drinking Baccardi 101 and Wild Turkey, and getting drunk every night for two weeks straight in October. Robbie got drunk every time Ben got drunk. Also while at Defendant's house, Robbie smoked cigarettes that Defendant gave him.

{7} An investigator from the attorney general's office retrieved information from Defendant's computer. Robbie used Defendant's computer, with a user identification given to him by Defendant. Robbie went to adult nude websites on the internet every day and often while Defendant sat right beside him. An expert from the attorney general's office determined that Robbie's user identification had been added to Defendant's account. He determined that Robbie's user identification was used to visit various pornographic and other adult websites.

{8} The district court informed the jury that Robbie died after the events at issue in the trial, and that the jury was not to speculate as to the circumstances of Robbie's death. Defendant was convicted of one count of contributing to the delinquency of a minor, based on providing alcoholic beverages; one count of contributing to the delinquency of a minor, based on providing access to pornographic websites; and one count of child abuse by endangerment, based on placing Robbie in a situation dangerous to his health or life. Defendant appeals, asserting that his conduct did not constitute child abuse by endangerment.

## DISCUSSION

### A. Standard of Review

{9} In determining whether evidence is sufficient to uphold a conviction, we view the evidence in the light most favorable to the State and indulge all permissible inferences in support of the verdict. *State v. Graham*, 2005–NMSC–004, ¶ 6, 137 N.M. 197, 109 P.3d 285; *State v. Sanders*, 117 N.M. 452, 456, 872 P.2d 870, 874 (1994). We make a legal determination whether the evidence viewed in that manner "could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt." *Graham*, 2005–NMSC–004, ¶ 6, 137 N.M. 197, 109 P.3d 285 (quoting *Sanders*, 117 N.M. at 456, 872 P.2d at 874) (emphasis omitted).

### B. Child Abuse by Endangerment

{10} In enacting Article 6 of the Criminal Code, which is entitled Crimes Against Children and Dependents, the Legislature set out crimes of (1) abandonment of a child, (2) abuse of a child, (3) abandonment of a dependent, (4) contributing to the delinquency of a minor, and (5) obstruction of reporting or investigation of child abuse or neglect. NMSA 1978, §§ 30-6-1 to -4 (1963, as

amended through 2004). The Legislature defined "child" as "a person who is less than eighteen years of age[.]" § 30–6–1(A)(1). Further, the Legislature made distinctions as to the perpetrators. Only a parent, guardian, or custodian can be prosecuted for abandonment of a child. § 30–6–1(B). Yet "a person" can be prosecuted for child abuse and "any person" can be prosecuted for contributing to the delinquency of a minor. §§ 30–6–1(D), –3.

{11} Commonly referred to as child abuse by endangerment, the crime of which Defendant was convicted proscribes "knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health[.]" § 30–6–1(D)(1). In the present case, Defendant was charged in the jury instruction only with the "causing" element, and not the "permitting" element, of Section 30–6–1(D). To sustain a conviction under this third degree felony statute, "[t]here must be a reasonable probability or possibility that the child will be endangered." *Graham*, 2005–NMSC–004, ¶ 9, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted). The State does not have to prove that the child suffered physical harm. *Id.* "However, ... the Legislature did not intend to criminalize conduct creating a mere possibility, however remote, that harm may result to a child." *Id.* (internal quotation marks and citation omitted).

{12} The jury was not instructed on the definition of "endangered." When a common term is used, the jury may properly apply the common meaning of the term. *See State v. Carnes*, 97 N.M. 76, 79, 636 P.2d 895, 898 (Ct.App.1981). To "endanger" is "to bring into danger or peril" or "to create a dangerous situation." *Merriam–Webster's Collegiate Dictionary* 380 (10th ed.2002). *Black's Law Dictionary* defines "child endangerment" as "[t]he putting of a child in a place or position that exposes him or her to danger to life or health." *Black's Law Dictionary* 189 (7th ed.2000).

{13} A defendant may be convicted when his actions are negligent, judged under a criminal negligence standard. Criminal negligence, as defined in Section 30–6–1(A)(3), "means that a person knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of the child." *See also State v. Castaneda*, 2001–NMCA–052, ¶ 20, 130 N.M. 679, 30 P.3d 368 (discussing the criminal negligence requirement and the Section 30–6–1(A)(3) definition of "negligently"). A reckless disregard requires that the defendant " 'knew or should have known [his] conduct created a substantial and foreseeable risk, [he] disregarded that risk and ... was wholly indifferent to the consequences of the conduct and to the welfare and safety' of the child." *Graham*, 2005–NMSC–004, ¶ 8, 137 N.M. 197, 109 P.3d 285 (quoting UJI 14–604 NMRA).

{14} Several New Mexico cases have applied the child abuse by endangerment statute to conduct when the situation endangered the child's life or health but no actual physical harm befell the child. *See id.* ¶¶ 2, 10–12, 14 (sustaining conviction as to a one-year-old child and a three-year-old child living in a home because of the existence of marijuana and a marijuana bud at various locations in the home accessible to the children); *State v. McGruder*, 1997–NMSC–023, ¶¶ 37–38, 123 N.M. 302, 940 P.2d 150 (upholding conviction of child abuse by endangerment where the defendant threatened a child's mother with a gun while child was standing behind her mother even though the child was not touched or physically harmed); *Castaneda*, 2001–NMCA–052, ¶¶ 7, 17, 130 N.M. 679, 30 P.3d 368 (noting that driving while intoxicated with unbuckled children in the car can constitute child abuse by endangerment and that "[a] defendant may be found guilty of third degree child abuse even if the child was never actually in danger or even likely to suffer harm"); *State v. Ungarten*, 115 N.M. 607, 609–10, 856 P.2d 569, 571–72 (Ct.App. 1993) (upholding conviction where the defendant brandished and thrust a knife in the direction of a nearly eleven-year-old child and his father and the child could not tell if the thrust was directed at him or his father). *But see State v. Trujillo*, 2002–NMCA–100, ¶¶ 1, 4–5, 19–20, 132 N.M. 649, 53 P.3d 909 (reversing conviction when an eight-year-old

child was in a separate room from the room in which domestic violence was occurring and the child was neither exposed to significant risk of physical danger by direct threat nor in the direct line of danger); *State v. Roybal,* 115 N.M. 27, 34, 846 P.2d 333, 340 (Ct.App. 1992) (reversing conviction where six-year-old child was in a car with her mother some ten to fifteen feet away from where her father was conducting a drug transaction, and stating, "[o]n the record before us, this charge was not supported by substantial evidence indicating that [the child] was in fact placed in danger").

{15} The cases do not expressly discuss the Section 30–6–1(D) elements of "causing or permitting." The cases illustrate, nevertheless, that convictions for child abuse in this jurisdiction have arisen from situations ranging from more direct and active threatening conduct with a child in a line of physical danger to less direct and more passive conduct that creates a dangerous condition with a child in close proximity to the dangerous condition. At the active end of the spectrum, under *McGruder,* a person's threatening, violent conduct where the child is in a direct line of physical danger constitutes child abuse. 1997–NMSC–023, ¶ 38, 123 N.M. 302, 940 P.2d 150. In mid-court, under *Castaneda,* a person's conduct, driving while intoxicated with children in the vehicle, constitutes child abuse. 2001–NMCA–052, ¶ 22, 130 N.M. 679, 30 P.3d 368. And, at the passive end, under *Graham,* a parent's allowance of young children to be in the immediate vicinity of a controlled substance, where the substance is accessible to an infant and a three-year-old, constitutes child abuse. 2005–NMSC–004, ¶ 14, 137 N.M. 197, 109 P.3d 285. *Trujillo* and *Roybal* may be characterized as falling in the situational neighborhood of *Castaneda* and *Graham,* but falling outside of the proximity required for endangerment. The analyses in these cases focused on the manner in which and extent to which the defendant created a dangerous situation and brought a child into or exposed a child to danger or peril.

■ {16} *Graham* appears to have injected an inquiry in addition to proximity with respect to endangerment, namely, the child's susceptibility to harm. *Graham* determined there was a "reasonable possibility of danger to the very young children from ingesting the marijuana." 2005–NMSC–004, ¶ 14, 137 N.M. 197, 109 P.3d 285. The children's mother testified she believed that if the children had ingested the marijuana, they would have become sick. *Id.* ¶ 4. Along that line, our cases indicate that the statute is intended to protect "defenseless" children. "The [L]egislature's decision to criminalize the conduct described by the statute reflects a compelling public interest in protecting defenseless children. [C]hildren, who are often times defenseless, are in need of greater protection than adults." *Id.* ¶ 9 (internal quotation marks and citations omitted). In the present case, Robbie's susceptibility to Defendant's offerings, his ability to protect himself, and his exposure to harm, are fair inquiries on the issues of causation and endangerment. Because recklessness requires that the potential harm be both foreseeable and substantial, we review the child's age, vulnerability, and the potential for harm as relevant inquiries.

## DEFENDANT'S CONTENTIONS

{17} Defendant raises issues in regard to the elements of endangerment, causation, and criminal negligence. In regard to causation and endangerment, Defendant contends no rational jury could have found that his conduct in allowing Robbie to be in his home, unclean as it was, created a reasonable probability or possibility that Robbie would be endangered. Defendant argues that he did not place Robbie in a line of physical danger or significant and articulable harm, or harm that was reasonably likely to come to pass. Defendant emphasizes that the risks involved from being in an unhealthy environment are not comparable to the immediate risks involved in being shot, stabbed, or in a vehicle accident, distinguishing the present case from *Graham, McGruder, Ungarten,* and *Castaneda.* Defendant relies on *Trujillo* and *Roybal* in which this Court essentially held that the mere proximity of a child to violence, without any direct threat or placement in a line of physical danger (*Trujillo*), or the mere proximity to a drug transaction where violence was only possible (*Roybal*), was in-

sufficient to convict under the child abuse by endangerment statute. *See Trujillo*, 2002–NMCA–100, ¶¶ 4–5, 19–20, 132 N.M. 649, 53 P.3d 909; *Roybal*, 115 N.M. at 34, 846 P.2d at 340. In Defendant's view, there existed nothing more than a "mere possibility of some harm to Robbie ... by simply being present in [Defendant's] home," circumstances that "extend[ ] beyond the scope of the child abuse statute."

{18} Thus, Defendant argues that his abnormal conduct does not amount to child abuse under the statute because his conduct and the circumstances did not create anything but speculative harm and were not what the Legislature intended to classify as a third degree felony. As part of his argument, Defendant states that Robbie was an almost grown-up boy able to distinguish between good and contaminated food and to reject bad food, and that Robbie was at no greater risk in the home than an adult would be.

{19} In regard to criminal negligence, Defendant contends that the evidence was insufficient to show that he was indifferent to the consequences as to the health and safety of Robbie. Defendant argues that because he resided in his own home without health or safety problems having arisen, he could not foresee a substantial risk of harm to Robbie or be wholly indifferent to the consequences of the risk as the law requires. *See State v. Mascarenas*, 2000–NMSC–017, ¶¶ 9–11, n. 4, 129 N.M. 230, 4 P.3d 1221 (discussing civil and criminal negligence and the propriety of an instruction defining reckless disregard in a criminal context as one stating the defendant was wholly indifferent to the substantial and foreseeable risk one's conduct creates). To uphold his conviction, Defendant asserts, is to place at risk of a third degree felony conviction those parents whose homes are filthy, like his, due to a civil type of negligence where there is no intent to harm children.

## THE STATE'S CONTENTIONS

{20} At trial, the State argued that Defendant essentially lured Robbie to his house with items Robbie could not reasonably procure at home, alcohol and pornography, and repeatedly placed Robbie in the filthy and harmful environment Defendant had created.

On appeal, the State argues that the evidence of endangerment is that Robbie was at Defendant's house on a daily basis for hours at a time drinking alcohol provided by Defendant; the house was replete with animal feces, rotten food, unrestrained animals, and general filth; and that these circumstances resulted in stench that caused at least two visitors to nearly vomit upon entry. The State argues that the potential harm of sickness or disease from the environment was not remote, speculative, or insignificant, and the conditions were potentially hazardous to anyone's health, including, particularly, Robbie's health because of his repeated exposure to the conditions. In regard to Defendant's conduct, the State argues that "[t]he extreme condition of the house, coupled with Defendant's obvious knowledge of it and continuing fostering of his relationship with Robbie and providing him with alcohol, was sufficient for the jury to find reckless disregard for Robbie's health, safety and welfare."

{21} Outside of New Mexico cases, the State relies on cases from other jurisdictions that have upheld convictions for child abuse arising from filthy conditions in homes. *See State v. Piep*, 84 P.3d 850 (Utah Ct.App. 2004); *Provo City v. Cannon*, 994 P.2d 206 (Utah Ct.App.1999); *State v. Deskins*, 152 Ariz. 209, 731 P.2d 104 (Ct.App.1986); *State v. Smith*, 130 Ariz. 74, 634 P.2d 1 (Ct.App. 1981). As we discuss below in this opinion, we are not persuaded by the State's arguments that the evidence was sufficient to convict Defendant of criminal child abuse by endangerment under Section 30–6–1(D)(1). Nor are we persuaded by any of the out of state authority on which the State relies. The cases are all significantly distinguishable as to such critical factors as the age of the child, the condition existing in a home where the child lived, or the coverage of the applicable statute.

## THE EVIDENCE WAS INSUFFICIENT TO CONVICT

{22} The evidence does not portray a defenseless child too young to protect himself from the filthy and unhealthy conditions in the home. We can understand that there may exist conditions of the home that might create a potential for harm to a child somewhat younger than Robbie—a child that is not old enough to· understand or appreciate

the health hazard from filth, feces, and stench. But here, Robbie, fifteen years old, was not living in the home or required to live there. He chose to visit, presumably able at his age to understand the health hazard and avoid consuming rotten food or any other sort of animal excrement. The fact there was rotten food in the house was insufficient for conviction. There was no evidence that Robbie himself cooked while at Defendant's or that Defendant mistook rotten meat for good meat when cooking for Robbie. There was no evidence that Robbie became sick. Nor was there evidence that animal feces would likely cause Robbie any significant health problems or that he was particularly susceptible to a perceived endangerment.

{23} In essence, the State's case was nothing more than that the child abuse by endangerment statute criminalizes the filthy conditions of a non-controlling caretaker's home continually made available to a fifteen-year-old boy. Absent evidence showing the particular susceptibility to endangerment of a child who has reached fifteen years of age, we do not believe the evidence was sufficient for a rational jury to conclude from common experience beyond a reasonable doubt that the situation was sufficiently precarious such that Robbie was on a reasonably sure path to harm's way with unfortunate health consequences reasonably likely to result. *See State v. Sanders,* 117 N.M. 452, 456, 872 P.2d 870, 874 (1994) (explaining that appellate courts review evidence with deference to the findings of the fact finder and determine whether the evidence viewed in this manner "could justify a finding by any rational trier of fact that each element of the crime charged has been established beyond a reasonable doubt").

## CONCLUSION

{24} We reverse Defendant's conviction for child abuse by endangerment.

{25} IT IS SO ORDERED.

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge, CYNTHIA A. FRY, Judge.