# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2018-NMSC-021

Filing Date: March 5, 2018

Docket No. S-1-SC-35382

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

JUAN GALINDO,

      Defendant-Appellant.

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY
Jacqueline D. Flores and Cristina T. Jaramillo, District Judges

Bennett J. Baur, Chief Public Defender
B. Douglas Wood, III, Assistant Public Defender
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**VIGIL, Justice.**

**{1}** In this horrific case, we affirm Defendant Juan Galindo's convictions for child abuse resulting in the death of his twenty-eight-day-old daughter (Baby) and his convictions for two counts of aggravated criminal sexual penetration (CSP) of Baby. We also affirm Defendant's convictions for child abuse against his thirteen-year-old daughter, B.G., for endangering her emotional health. In addition, we hold that the district court properly admitted into evidence a statement that Defendant gave to law enforcement on the night of Baby's death, as well as photographic evidence revealing the extensive injuries Baby

1

suffered, including fatal, blunt-force trauma to her head and multiple internal and external injuries to her genital and anal areas. We remand this case for resentencing in light of Defendant's duplicative convictions of child abuse resulting in Baby's death and of child abuse against B.G.

## I.    BACKGROUND

{2}    Deputies from the Bernalillo County Sheriff's Department were dispatched to Defendant's home at approximately 3:50 a.m. in response to a call for assistance about an infant who was "choking on milk." When the deputies arrived, they were directed to Defendant's bedroom, where they found Baby wrapped tightly in a blanket that was saturated with blood near her pelvic area. Baby's face appeared bruised and swollen, and she had dried blood near her nose and mouth. Paramedics arrived a short time later and observed that Baby's body was stiff and cool to the touch. Upon removing Baby's clothing, they noted that she was not wearing a diaper and that she had dried blood near her groin area, bruising on her chest, and a distended abdomen. Baby was declared dead at 7:10 a.m., and her body was taken for an autopsy by the Office of the Medical Investigator (OMI).

{3}    Dr. Proe, a forensic pathologist with the OMI, performed Baby's autopsy and testified at Defendant's trial about her findings. Dr. Proe described Baby's injuries in detail using photographs that were admitted into evidence over Defendant's objection. According to Dr. Proe, Baby had extensive bruising, including on her face, head, vagina, and anus. Baby also had scrapes and tears of the skin and tissue on her right cheek, around and inside her vagina, and around her anus. Internally, Baby had a skull fracture from the back of her head into the base of her skull, bleeding in the deep tissue of her scalp, and bruising and bleeding in her brain. Baby also had "more than a dozen" rib fractures; a torn liver; and bleeding around her intestines, in the soft tissue behind her vagina, and around her spinal cord.

{4}    Ultimately, Dr. Proe concluded that the cause of Baby's death was "multiple blunt force injuries." She clarified, however, that the injuries to Baby's head were "the most severe" and would have been sufficient on their own to cause Baby's death. Dr. Proe also concluded that the injuries to Baby's groin occurred "prior to death" and resulted from separate penetrations of her anus and vagina by a blunt object. Finally, Dr. Proe testified that Baby did not show any signs of choking or of obstructions of her airways. Defendant's medical expert testified at trial and agreed that Baby had died from her head injury and that she did not show signs of choking, coughing, or aspiration.

{5}    The State offered testimony about DNA testing that had been done on a number of swabs taken from Baby's vagina, anus, mouth, and a bite mark on her cheek. A DNA analyst testified that she had identified a small number of sperm cells on a swab taken from inside Baby's mouth. A second analyst testified that Defendant could not be excluded as the contributor of the male DNA on the oral swab.

**{6}** On the morning that Baby died, Defendant was interviewed by Detective Roybal at the department's main office about Baby's death. A video recording of a portion of the interview was admitted into evidence and played for the jury at trial. In the video, Defendant began by explaining that Baby's mother, Pauline, had left with a friend at about 8:00 p.m. to go to the store. After Pauline left, Defendant went out to the shed to work until 9:30 or 10:00 p.m., while B.G. and the other kids watched a movie and kept an eye on Baby. When Defendant came back inside, he gave Baby a bottle, and she "drank about half." Defendant burped her and thought that "she was good."

**{7}** Defendant explained that next, he changed his clothes and laid down on the bed to rest beside Baby, who was in her bassinet. Suddenly, he looked over and saw that Baby was choking and that her eyes were rolling back. Defendant was frightened that Baby was not breathing and was in danger, so he patted her on the chest and stuck his fingers in her mouth. When that did not help, he started panicking and calling to his daughter, B.G. He took off Baby's clothes and ran out to the kitchen and asked B.G., "What do I do?" B.G. nearly fainted when she saw Baby. Defendant asked B.G. to get some ice to rub on Baby's body, and when Baby did not respond, he panicked and bit Baby hard enough to make her bleed on her lip and cheek. Defendant described rubbing a "little alcohol pad" under Baby's nose, blowing in her mouth, and rubbing perfume on her face, all in an attempt to revive her. He also said that he had hit Baby hard on the chest and slapped her back and forth across the face. Defendant saw that Baby was bleeding from her mouth, and he kept asking B.G., "What do I do?" B.G. responded that Baby was dead. Defendant eventually wrapped Baby in a blanket and took her body outside and sat with her underneath the porch for "like three hours," until Pauline came home.

**{8}** Later in the interview, Defendant said that he had taken Baby into the shower at one point to put water on her, that he had slipped, and that she may have hit the back of her head. And after some prompting by Detective Roybal about why Baby had been bleeding from her vagina, Defendant said that he had poked olive oil inside her butt with his finger because she had been constipated. Defendant also used a doll, at Detective Roybal's request, to demonstrate how he had hit Baby on the chest and stomach and had poked inside her butt, "one or two" times. At another point in the interview, Defendant admitted to smoking methamphetamine daily, including "a few tokes" that afternoon, but he claimed that he did not feel high at the time of Baby's death. Defendant also explained that he did not seek help from his brother-in-law or call for help because he was "panicked" and "scared."

**{9}** Defendant was indicted on numerous charges related to the death, abuse, and sexual assault of Baby and the abuse of B.G. and her two younger siblings who were present on the night that Baby died. At the conclusion of Defendant's trial, the jury was instructed on four theories of child abuse resulting in Baby's death, two counts of aggravated CSP of Baby, six theories of child abuse resulting in great bodily harm to Baby, and three theories of child abuse not resulting in death or great bodily harm to B.G. The jury acquitted Defendant of child abuse resulting in great bodily harm to Baby and convicted him of all of the remaining offenses. The district court entered judgment and sentence on each of Defendant's

3

convictions and, by ordering some of the sentences to run concurrently and others consecutively, sentenced Defendant to two consecutive terms of life imprisonment followed by three years of imprisonment for the abuse of B.G. Defendant appealed. We exercise jurisdiction under Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA.

## II.  DISCUSSION

**{10}**  Defendant argues that there were three errors on appeal: (1) his convictions are not supported by sufficient evidence, (2) his statements to police were involuntary and should not have been admitted at trial, and (3) the district court abused its discretion by admitting photographs of Baby's body and injuries that prejudiced his defense. We address these arguments in turn.

### A.  Defendant's Convictions Were Supported by Sufficient Evidence

**{11}**  We begin with Defendant's challenge to the sufficiency of the evidence to support his convictions for child abuse of B.G. because it poses the closest question in this appeal. We then address his other challenges to the sufficiency of the evidence in summary fashion.

**{12}**  "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 26, 114 N.M. 269, 837 P.2d 862 (alteration, emphasis, internal quotation marks, and citation omitted).

### 1.  Child abuse based on endangering B.G.'s emotional health

**{13}**  The jury found Defendant guilty of child abuse not resulting in death or great bodily harm to B.G. based on three alternative theories of abuse under NMSA, Section 30-6-1(D)(1) (2009): (1) *intentionally causing* B.G. to be placed in a situation that endangered her life or health, (2) *recklessly causing* B.G. to be placed in a situation that endangered her life or health, and (3) *recklessly permitting* B.G. to be placed in a situation that endangered her life or health. The State conceded at trial and on appeal that the evidence supporting each theory of abuse against B.G. was limited to endangerment of her "emotional health" and that her physical health had "certainly not" been endangered by Defendant's conduct. We therefore limit our review to whether the State introduced sufficient evidence that Defendant endangered B.G.'s emotional health.

4

**{14}** Defendant challenges the evidence supporting his convictions on two fronts. First, he argues that the child abuse statute, Section 30-6-1(D), "does not contemplate, nor even mention, a child's emotional harm," and therefore does not support a conviction based on endangerment of a child's emotional health. Second, he argues that the State has "fail[ed] to articulate any injury to B.G., emotional or otherwise."

**{15}** Defendant's first argument is answered by *State v. Ramirez*, 2018-NMSC-003, ¶ 50, 403 P.3d 902. *Ramirez* clarified "that Section 30-6-1(D)(1) encompasses abuse by endangerment that results in physical *or emotional* injury as well as those circumstances where the abused child suffers no injury of any kind at all." *Id.* (emphasis added) (citing *State v. Trujillo*, 2002-NMCA-100, ¶ 20, 132 N.M. 649, 53 P.3d 909 ("[T]here may be instances when the risk of emotional harm from a similar incident might be sufficient to support a conviction based on endangerment.")); *see also State v. McGruder*, 1997-NMSC-023, ¶¶ 2, 38, 123 N.M. 302, 940 P.2d 150 (affirming a child endangerment conviction based on evidence that the two-year-old child was "cr[ying] throughout the ordeal," including while she stood behind her mother as the defendant aimed a gun at and threatened to kill her), *abrogated on other grounds by State v. Chavez*, 2009-NMSC-035, ¶¶ 2, 16, 47 n.1, 146 N.M. 434, 211 P.3d 891. In light of *Ramirez*, we hold that just as when a child's physical health is endangered, the crime of child abuse by endangerment may be based on evidence of "a truly significant risk of serious harm" to a child's emotional health. *Chavez*, 2009-NMSC-035, ¶ 22.

**{16}** Turning to Defendant's second argument, we consider whether the State introduced sufficient evidence that Defendant endangered or injured B.G.'s emotional health. The jury instructions for the alternative counts of *intentionally causing* and *recklessly causing* abuse to B.G. required a finding that "[D]efendant caused [B.G.] to be placed in a situation which endangered the life or health of [B.G.]." *See* UJI 14-604 NMRA (2000, withdrawn 2015); *see also* UJI 14-612 NMRA (effective April 3, 2015). Defendant argues that, under either instruction, B.G.'s "life and health were not endangered" and that the State failed to introduce "evidence of any possible harm to B.G." or "evidence of the type or nature of the emotional injury" that B.G. may have suffered. We disagree. Defendant views the evidence too narrowly and, in particular, minimizes B.G.'s testimony about her traumatic experience on the night that Baby died. We therefore summarize B.G.'s testimony before we address this argument.

**{17}** B.G. testified that, on the night that Baby died, she went to the kitchen to make herself some food and that she was "scared" and "shocked" to find Defendant kneeling on the floor, holding Baby's "purple, bluish" body and calling B.G.'s name. B.G. detailed how—even though she told Defendant several times that Baby was dead—Defendant persisted in his increasingly frantic attempts to revive Baby, which included putting Baby's naked body in the kitchen sink and rubbing ice on her, performing CPR on her "very hard," biting her, splashing water on her in the shower, and rubbing perfume on her body. B.G. also described how Defendant "started screaming [her] name again" and "just kept calling [her] name" to help him when she would run back to the other room to try to keep her younger

5

sister and brother away from Defendant and Baby. B.G. testified that she suggested going to get help from relatives who lived nearby and that Defendant had told her, "No." And, she described how Defendant eventually tried to leave with Baby's body but could not get the car started; how B.G. looked for Defendant around 1:00 or 2:00 a.m. and could not find him; and how, shortly after Pauline got home, Defendant appeared from underneath the porch holding Baby's body. B.G. testified that Baby's death made her feel "dead inside."

**{18}**     We have little trouble concluding that the evidence of Defendant's conduct, as found by the jury and described by B.G., was sufficient to show that Defendant exposed B.G. to a truly significant risk of serious emotional harm. As we conclude later in this opinion, sufficient evidence supported the jury's findings that Defendant sexually assaulted and violently abused Baby, resulting in her death. Against that factual backdrop, B.G.'s testimony showed how Defendant, through his repeated calls and screams to B.G. for help, drew her into the frenzied aftermath of his crimes against Baby. B.G.'s testimony also showed how Defendant refused to allow her to seek help and how his efforts to revive Baby became increasingly extreme despite B.G.'s assurances that Baby was dead. And B.G.'s testimony showed how she felt "shocked," "scared," and like she was "dead inside" during and after the events on the night that Baby died. Based on this evidence, the jury reasonably could have found that Defendant endangered B.G.'s emotional health by compelling her to witness and participate in the further abuse of Baby's lifeless body, as Defendant tried to undo the effects of what he already had done. Under these circumstances, the risk of harm to B.G.'s emotional health posed by Defendant's conduct is manifest. *Cf. Folz v. State*, 1990-NMSC-075, ¶ 40, 110 N.M. 457, 797 P.2d 246 (" 'It is hard to imagine a mental injury that is more believable than one suffered by a person who witnesses the serious injury or death of a family member.' " (quoting *Gates v. Richardson*, 719 P.2d 193, 197 (Wyo. 1986))).

**{19}**     To be sure, the State took a risk by not calling an expert to testify about the actual or likely effects of Defendant's actions on B.G.'s emotional health. In a closer case, such an omission could be fatal to the State's case. *See, e.g.*, *Trujillo*, 2002-NMCA-100, ¶ 20 ("In theory, the State might lay an adequate evidentiary foundation proving the likelihood of harm to a child's emotional health as a result of witnessing such an attack on her mother. . . . However, the State presented no such evidence in this case."); *see also Chavez*, 2009-NMSC-035, ¶ 40 ("The State could have met its burden in this case. The risk of serious disease or illness is a matter of science and can be established with empirical and scientific evidence."). But to hold that there was insufficient evidence of a truly significant risk of serious harm to B.G.'s emotional health would be to turn a blind eye to the horrors that she experienced as a result of Defendant's actions on the night that Baby died.

**{20}**     Thus, under the facts of this case, the jury could apply its common knowledge and experience to conclude that Defendant endangered B.G.'s emotional health. *Cf. State v. Sena*, 2008-NMSC-053, ¶ 20, 144 N.M. 821, 192 P.3d 1198 ("Lay persons are well-aware of what it means to act with a sexual intent, and therefore can identify behavior as exhibiting that trait without the aid of an expert witness."). Sufficient evidence therefore supported Defendant's alternative convictions for *intentionally causing* and *recklessly causing* B.G. to

6

be placed in a situation that endangered her life or health.

**{21}** As a final matter, it appears from the record that the jury was improperly instructed on the alternative theory of *recklessly permitting* B.G. to be placed in a situation that endangered her life or health. At the close of the State's evidence at trial, the district court properly granted Defendant's motion for a directed verdict on all of the alternative child abuse counts that were based on a theory of *permitting* abuse. The district court explained, "Anything where you see the word 'permitted,' essentially," should be dismissed because the evidence did not suggest that a third person was involved in the abuse. *See State v. Nichols*, 2016-NMSC-001, ¶ 33, 363 P.3d 1187 ("[C]*ausing* child abuse is synonymous with inflicting the abuse, and *permitting* child abuse refers to the passive act of failing to prevent someone else—a third person—from inflicting the abuse."). Defendant's conviction for *recklessly permitting* B.G. to be placed in a situation that endangered her life or health is similarly not supported by evidence that anyone other than Defendant inflicted the abuse against B.G. We therefore reverse his conviction under that single alternative theory.

## 2. Child abuse resulting in Baby's death

**{22}** We next consider the sufficiency of the evidence to support Defendant's convictions of child abuse resulting in Baby's death. The jury found Defendant guilty under four separate theories of abuse under Section 30-6-1: (1) *intentionally* causing Baby to be *placed in a situation that endangered her life or health*, resulting in the death of a child under twelve years of age, contrary to Sections 30-6-1(D)(1) and (H); (2) *intentionally* causing Baby to be *tortured, cruelly confined, or cruelly punished*, resulting in the death of a child under twelve years of age, contrary to Section 30-6-1(D)(2) and (H); (3) *recklessly* causing Baby to be *placed in a situation that endangered her life or health*, resulting in the death of a child, contrary to Section 30-6-1(D)(1) and (F); and (4) *recklessly* causing Baby to be *tortured, cruelly confined, or cruelly punished*, resulting in the death of a child, contrary to Section 30-6-1(D)(2) and (F). Defendant challenges the sufficiency of the evidence supporting all four guilty verdicts.

**{23}** We begin with Defendant's challenge to his conviction of intentional child abuse resulting in Baby's death. The jury instructions, which are not challenged on appeal, required the jury to find, in part, that Defendant acted "intentionally and without justification" when he "caused [Baby] to be placed in a situation which endangered the life or health of [Baby]." Defendant argues that there was insufficient evidence that he acted "intentionally and without justification" because the evidence showed—not that he meant to harm Baby—but that he was attempting "to shock [her] into consciousness after he found her not breathing."

**{24}** Defendant made this very argument to the jury at trial, and the jury rejected it. "We will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting our judgment for that of the jury." *State v. Cabezuela*, 2015-NMSC-016, ¶ 23, 350 P.3d 1145 (alterations, internal quotation marks, and citation omitted). The jury was free to credit

7

certain evidence that did not support Defendant's explanation of Baby's injuries. Such evidence included Defendant's interview statements that he was alone with Baby in the bedroom before she stopped breathing; expert testimony that Baby did not show signs of choking and that she died from blunt force trauma to her head; and B.G.'s testimony that Baby was already "purple, bluish" when she first saw Defendant and Baby in the kitchen, that Baby seemed dead "from the start," and that Baby never cried or responded during Defendant's attempts to revive her. The jury also could have found that Defendant was not credible because of inconsistencies between his explanation of Baby's injuries and the medical evidence, particularly about the injuries to her groin area. Based on all of this evidence, including Baby's extremely young age and the extent and severity of her injuries—particularly to her head—the jury could have reasonably concluded that Defendant acted intentionally and without justification. We therefore affirm Defendant's conviction for intentionally causing Baby to be placed in a situation that endangered her life or health, resulting in the death of a child under twelve years of age.

{25}    The same evidence supports Defendant's convictions under each of the alternative theories of child abuse resulting in death. Evidence that Defendant *intentionally* caused Baby to be placed in a situation that endangered her life or health, resulting in her death, also satisfies the jury's alternative finding that Defendant *recklessly* caused such abuse. *See State v. Montoya*, 2015-NMSC-010, ¶ 41, 345 P.3d 1056 ("[O]ne cannot intentionally commit child abuse without 'consciously disregard[ing] a substantial and unjustifiable risk,' the definition of recklessness." (second alteration in original) (quoting *State v. Consaul*, 2014-NMSC-030, ¶ 37, 332 P.3d 850)). Similarly, the evidence that Defendant caused Baby to be *placed in a situation that endangered her life or health*, coupled with the State's consistent theory that Defendant violently abused Baby, resulting in her death, also supported the jury's alternative findings that he intentionally caused and recklessly caused Baby to be *tortured, cruelly confined, or cruelly punished*, resulting in her death. *See State v. Lucero*, 2017-NMSC-008, ¶ 37, 389 P.3d 1039 ("[W]hether denominated as abuse by endangerment or as abuse by torture, cruel confinement, or cruel punishment, the State's case against [the defendant] was always based on a theory that he intentionally, physically abused [the baby], resulting in her death."). Sufficient evidence thus supported each of Defendant's convictions of child abuse resulting in Baby's death.

## 3.    Aggravated CSP

{26}    Defendant next challenges the sufficiency of the evidence supporting his two convictions of aggravated CSP of a child under thirteen years of age. The jury was given the following instruction for the count that specified penetration of Baby's vagina:

> 1. [Defendant] caused the insertion, to any extent, of an object into the vagina or vulva of [Baby];
> 2. [Baby] was twelve (12) years of age or younger;
> 3. The act of [Defendant] was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life;

4. [Defendant's] act was unlawful;

5. This happened in New Mexico on or between the 28th day of December, 2011 and the 29th day of December, 2011.

*See* UJI 14-972 NMRA. The jury instruction for the second count was identical except that the first element specified penetration of Baby's anus. Defendant does not dispute that there was sufficient evidence to prove the first element of both instructions. Rather, he argues that the State did not prove that he acted with "a depraved mind without regard for human life" or that his acts were unlawful. Defendant contends that he acted lawfully, in the interest of saving his daughter's life.

**{27}** As with Defendant's conviction of intentional child abuse resulting in Baby's death, the jury apparently credited certain evidence that did not support Defendant's explanation of events. The jury was free to do so, and we will not substitute our judgment for that of the jury. *See Cabezuela*, 2015-NMSC-016, ¶ 23. The jury could have concluded that Defendant acted both unlawfully and with a depraved mind without regard for human life based on the evidence of Baby's very young age and the severity of the separate injuries to her vagina and anus, which Dr. Proe described as consistent with a blunt object having "been inserted into that area, either forcefully, or if that object was larger than the [orifice]." The jury also could have rejected Defendant's explanation that he was trying to save Baby's life because of the evidence of sperm cells in Baby's mouth. Sufficient evidence supported Defendant's convictions of aggravated CSP.

## 4. Defendant's duplicative convictions must be vacated

**{28}** Before we address Defendant's remaining arguments, we hold sua sponte that the district court erred by entering judgment and sentence on each of Defendant's four alternative convictions of child abuse resulting in Baby's death and on each of his three alternative convictions of child abuse of B.G. When a jury returns multiple guilty verdicts based on alternative theories of the same offense, the district court must vacate the duplicative convictions to avoid violating the constitutional proscription against double jeopardy. *See State v. Mercer*, 2005-NMCA-023, ¶ 29, 137 N.M. 36, 106 P.3d 1283 ("The State is authorized to charge in the alternative. However, Defendant's convictions for both alternatives violate her right to be free from double jeopardy." (citation omitted)); *see also, e.g.*, *State v. Silvas*, 2015-NMSC-006, ¶ 8, 343 P.3d 616 ("Double jeopardy protects against multiple punishments for the same offense."). And as we held in *State v. Pierce*, the constitutional error is not rendered harmless by the district court's imposition of concurrent sentences for the duplicative convictions. *See* 1990-NMSC-049, ¶¶ 47-49, 110 N.M. 76, 792 P.2d 408 (citing *Ball v. United States*, 470 U.S. 856, 864-65 (1985) ("The second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence. The separate *conviction*, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored.")).

**{29}** On remand, Defendant's duplicative convictions therefore must be vacated,

consistent with our case law. *See Pierce*, 1990-NMSC-049, ¶¶ 47-49; *see also, e.g.*, *State v. Montoya*, 2013-NMSC-020, ¶ 55, 306 P.3d 426 ("[W]here one of two otherwise valid convictions must be vacated to avoid violation of double jeopardy protections, we must vacate the conviction carrying the shorter sentence."); *see also Mercer*, 2005-NMCA-023, ¶ 29 (expressing no opinion on which alternative conviction should be vacated if the convictions are for "the same degree felonies").

## B.    Defendant's Interview Statements Were Voluntary

**{30}**    Defendant argues that his incriminating statements to law enforcement during his interview at the police station should have been suppressed under the Fifth and Fourteenth Amendments of the United States Constitution and under Article II, Section 15 of the New Mexico Constitution. Defendant contends that, although he signed an acknowledgment and waiver of his rights to remain silent, to have an attorney present, and to stop the interview at any time, his statements were coerced and involuntary because he "was functioning under the extreme mental stress of having just witnessed the infant die and not being able to prevent it." As such, Defendant argues that the admission into evidence of the video of his interview was reversible error. We review the voluntariness of Defendant's statements to Detective Roybal de novo. *State v. Cooper*, 1997-NMSC-058, ¶ 25, 124 N.M. 277, 949 P.2d 660.

**{31}**    In determining whether a confession is voluntary, "we examine the 'totality of the circumstances' surrounding the confession in order to decide the ultimate question of voluntariness." *State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708 (citations omitted). To satisfy due process standards, a confession "must have been freely given and not induced by promise or threat." *Aguilar v. State*, 1988-NMSC-004, ¶ 11, 106 N.M. 798, 751 P.2d 178. "[A] confession is not involuntary solely because of a defendant's mental state. Instead, the totality of circumstances test includes an element of police overreaching." *Fekete*, 1995-NMSC-049, ¶ 35 (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment.")).The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Fekete*, 1995-NMSC-049, ¶ 34.

**{32}**    Defendant does not argue that his statement was induced by promise or threat or was otherwise coerced—and with good reason. In examining the totality of the circumstances, we see no evidence that Detective Roybal used promises or threats to elicit Defendant's statements. *See Aguilar*, 1988-NMSC-004, ¶ 11. In fact, Defendant's own expert agreed at the suppression hearing that Detective Roybal had not coerced Defendant during the portion of the interview that eventually was played to the jury. Defendant's expert conceded, "I think it's actually a pretty darn good interview by the detective."

**{33}**    Instead of pointing to evidence of coercion, Defendant argues that "Detective Roybal overreached when he continued with the interrogation" after he "observed that [Defendant]

was not attentive to the nature of the rights he was giving up." Without citing any legal authority, Defendant implies that Detective Roybal was constitutionally required to end or delay the interview when Defendant asked about his family's well-being, rather than about his rights, as he signed the acknowledgment and waiver. This argument lacks merit. Our cases applying federal due process standards are clear: a finding of involuntariness must be based on some evidence that "the police used fear, coercion, hope of reward, or some other improper inducement." *Cooper*, 1997-NMSC-058, ¶¶ 44-49 (holding that the defendant's confession was voluntary when he "was most likely in a weakened mental state" and the officers used "psychological tactics of empathy and compassion" without fear, threats, or coercion). Absent evidence of such impropriety, Defendant's statements were not coerced or involuntary.

**{34}** Defendant argues that we should interpret Article II, Section 15 of the New Mexico Constitution to foreclose the admission of incriminating statements even when there is no evidence of coercion. N.M. Const. art. II, § 15 ("No person shall be compelled to testify against himself in a criminal proceeding . . . ."). Defendant urges us to follow *State v. Caouette*, in which the Maine Supreme Court held that "police elicitation or conduct . . . is not a *sine qua non* for exclusion" of a confession under the Maine Constitution. 446 A.2d 1120, 1123 (Me. 1982). Rather, "to find a statement voluntary, it must first be established that it is the result of [the] defendant's exercise of his own free will and rational intellect." *Id. Caouette* relied on and extended a previous interpretation of the Maine Constitution that required proof beyond a reasonable doubt of the voluntariness of a confession. *See id.* at 1122 (citing *State v. Collins*, 297 A.2d 620 (Me. 1972)); *contra Fekete*, 1995-NMSC-049, ¶ 34 ("The prosecution has the burden of proving the voluntariness of a defendant's statement by a preponderance of the evidence.").

**{35}** We decline to follow *Caouette* in this case. Instead, we continue to apply the federal rule: "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Connelly*, 479 U.S. at 164. Otherwise, every inculpatory statement would require courts to "divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." *Connelly*, 479 U.S. at 165-66. Defendant's case demonstrates that such a burdensome requirement would be unnecessary. The district court agreed with Defendant that, under existing law, a portion of his interview should be suppressed because Detective Roybal's questioning became "overtly coercive" and "he began to suggest some theories of what may have happened that night." Up to that point in the interview, however, we agree with the district court that the State met its burden to show by a preponderance of the evidence that Defendant's statements were voluntary and were not coerced.

## C.     The Photographs of Baby's Body Were Properly Admitted

**{36}** Defendant next argues that the district court erred by admitting photographs of Baby's body and injuries into evidence at trial. Before trial, Defendant moved to exclude "all

photographs of the victim's corpse at trial" under Rule 11-403 NMRA, including photographs taken by investigators at Defendant's trailer and during Baby's autopsy. The district court reviewed all of the photographs proffered by the State in a pretrial hearing, excluded six as cumulative and admitted the rest. Defendant argues on appeal that the photographs are "gruesome" and that their admission was unfairly prejudicial and cumulative of trial testimony.

**{37}** Under Rule 11-403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . or needlessly presenting cumulative evidence." "The trial court is vested with great discretion in applying Rule [11-403], and it will not be reversed absent an abuse of that discretion." *State v. Martinez*, 1999-NMSC-018, ¶ 31, 127 N.M. 207, 979 P.2d 718 (alteration in original) (internal quotation marks and citation omitted). "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case." *State v. Moreland*, 2008-NMSC-031, ¶ 9, 144 N.M. 192, 185 P.3d 363 (internal quotation marks and citation omitted).

**{38}** "Graphic photographs of the injuries suffered by deceased victims of crime are by their nature significantly prejudicial, but that fact alone does not establish that they are impermissibly so." *State v. Bahney*, 2012-NMCA-039, ¶ 43, 274 P.3d 134. The test is whether they are admissible for a proper purpose, such as "depicting the nature of an injury, clarifying and illustrating testimony, and explaining the basis of a forensic pathologist's expert opinion." *Id.*

**{39}** The State argues that the photographs in Defendant's case were relevant to establish that the crimes actually occurred and that the photographs were necessary to refute Defendant's only defense—that he inflicted Baby's injuries in an attempt to revive her. We agree. The photographs are graphic, heartbreaking, and difficult to view, but they convey the nature and extent of Baby's injuries in a manner that words cannot. As the district court explained,

> [T]he reason these pictures are coming in, I think they are helpful to the jury. I think they certainly illustrate . . . clearly what the injuries are, but also they're in direct response to the Defendant's own statement, they essentially respond to the Defendant's recitation of the events, and that's really the strongest reason they need to come in.

Further, the district court made a reasoned determination on the record with respect to the photographs' admissibility, choosing to exclude other photographs of Baby. The district court properly exercised its discretion in admitting the photographs of Baby.

## III. CONCLUSION

**{40}** We affirm Defendant's convictions for child abuse resulting in Baby's death, for two

counts of aggravated CSP of Baby, and for causing B.G. to be placed in a situation that endangered her life or health. We reverse Defendant's conviction for *recklessly permitting* the abuse of B.G. for insufficient evidence. We remand for further proceedings, including vacating Defendant's duplicative convictions that were based on alternative theories, consistent with this opinion.

**{41}** **IT IS SO ORDERED.**

_____

**BARBARA J. VIGIL, Justice**

**WE CONCUR:**

_____

**JUDITH K. NAKAMURA, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**

_____

**CHARLES W. DANIELS, Justice**