This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-41017**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**FABIAN GONZALES a/k/a FABIAN ELIAS GONZALES,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Cindy Leos, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Charles J. Gutierrez, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Santa Fe, NM
Steven J. Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**BOGARDUS, Judge.**

**{1}** Defendant Fabian Gonzales appeals his conviction for reckless child abuse resulting in death of a child under age twelve, contrary to NMSA 1978, Section 30-6-1(F) (2009); as well his multiple counts of tampering with evidence (Counts 2, 3, 4, 5, 6, & 8), contrary to NMSA 1978, Section 30-22-5 (2003). On appeal Defendant argues: (1)

there was not sufficient evidence presented by the State to convict him of child abuse resulting in death of a child under twelve; (2) there was error in one of the jury instructions regarding the legal duty owed to a child when a defendant is charged with reckless child abuse; and (3) five of the seven convictions for tampering with the evidence violate Defendant's protections against double jeopardy. We affirm.

**BACKGROUND**

**{2}** The facts of this well-publicized case are horrific. Our background and analysis sections, therefore, are limited to facts necessary to explain our analysis. The circumstances of this case began when Defendant began dating Michelle Martens (Mother) in the beginning of August 2016, and quickly moved in with Mother and her two children, one of them being ten-year-old Victim. Shortly thereafter, Defendant's cousin, Jessica Kelley also moved into the apartment.

**{3}** On August 23, 2016, Victim was murdered in the apartment shared with her mother, Defendant, and Kelley. It was later determined that Victim's cause of death was strangulation. After her death, Victim had been dismembered and her body set on fire. When police arrived, they discovered Victim's body had been set on fire, her organs exposed and her leg mutilated.

**{4}** Following trial, Defendant was found guilty on August 2, 2022, of reckless child abuse resulting in the death of a child under twelve years of age and seven counts of tampering with evidence. He now appeals six of the initial seven counts.

**DISCUSSION**

**I.      Sufficiency of the Evidence**

**{5}** We begin by addressing Defendant's sufficiency of the evidence argument. Defendant argues that there is insufficient evidence to prove that he exposed Victim to an unsafe environment because the State was required to provide sufficient evidence for each of the actions listed in "Jury Instruction No. 14" for the jury to find him guilty. According to Defendant, the State failed to make such a showing beyond a reasonable doubt. We disagree.

**{6}** "In reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the [s]tate, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. In testing for sufficiency of the evidence it must be determined whether "substantial evidence of either a direct or circumstantial nature exists" to support a guilty verdict beyond a reasonable doubt in regard to every element essential to that verdict. *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). "This [C]ourt does not weigh the evidence and may not substitute its judgment for that of the fact[-

]finder so long as there is sufficient evidence to support the verdict." *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314.

**{7}** The element of Jury Instruction No. 14 with which Defendant takes issue required the jury to find, beyond a reasonable doubt, that

> [D]efendant exposed [Victim] to an unsafe environment that included [(1)] using drugs at the apartment on the day of the homicide, [(2)] engaging in threats of violence related to the fight at the barbeque opening up the possibility of retaliation, and [(3)] putting [Victim] in the care of . . . Kelley knowing that . . . Kelley was violent and/or paranoid and under the influence of methamphetamine [(meth)].

We address each element disputed by Defendant.

## A.   Drug Use

**{8}** First, there is sufficient evidence to prove that Defendant was using drugs at the apartment on the day of the murder. Kelley's testimony established that in the early morning, the day of Victim's murder, she and Defendant were both smoking meth in Mother's apartment. She testified that later that day, in the hours before the murder, Defendant smoked meth in the bathroom of the apartment. Defendant, although not denying his drug use on the day of the murder, argues that because Victim was ten years of age (not an infant) and unaware of his drug use, his use of meth did not expose Victim to an unsafe environment that resulted in Victim's death. We are unpersuaded by Defendant's argument.

**{9}** Defendant's drug use on the day of the murder was evidence of the dangerous environment that Defendant created in Victim's home. Kelley testified that she stayed with Defendant, and not with other family, because she "was using" and, as we have noted, Defendant and Kelley were using meth together. Defendant smoked meth in the bathroom before he and Mother left Victim in Kelley's care, who had shown irresponsible and unstable behavior throughout the day. A witness attributed Defendant's aggressive behavior at the barbecue to Defendant's drug use. Defendant's behavior at the barbeque is tied to the State's alternate theory that a stranger killed Victim in retribution for Defendant's aggressive behavior at the barbeque. Whether Kelley killed Victim, or a stranger killed her in retaliation for Defendant's threatening behavior, it was well within the jury's province to weigh the credibility of Kelley's testimony to determine whether Defendant's drug use created an unjustifiable risk of harm, endangering Victim and resulted in her death. We will not now question such determinations on appeal. *See Sutphin*, 1988-NMSC-031, ¶ 21 ("This court does not weigh the evidence and may not substitute its judgment for that of the fact[-]finder.").

## B.  Threats of Violence

**{10}** Next, Defendant maintains that there is no evidence tying his altercations at a barbeque—two days before—to Victim's murder. We disagree. Kelley and Defendant attended a barbeque hosted by their cousin, Amanda Padilla on August 21, 2016, two days before the murder. Padilla testified that even though Defendant was not invited to the barbeque because of an altercation that occurred previously between Defendant, Padilla and her fiancé, Defendant went anyway. After being told to leave, a fight began between Defendant and Padilla, until Defendant was forcibly removed from the residence. Defendant left in Mother's car. When he left, Defendant threatened he would be back "by there in a black SUV" and sent Padilla several text messages until late that night with threats against her and her fiancé. Several armed men waited for Defendant to return. Defendant researched gun purchases on his phone that evening, called his brother twenty times afterward, made other unusual calls, and searched on his cell phone for a gun to purchase. The case agent testified and confirmed that in his experience, "people get killed over threats."

**{11}** Kelley testified that on the night of the murder, an unknown man entered the apartment and asked her where Defendant was. She testified that she told him she was alone with Victim, and gestured to Victim's room. She further testified that she went out on the balcony to smoke a cigarette and then saw the man coming out of Victim's room. According to Kelley, when he was leaving, the man told her that there was a mess in Victim's room and that Defendant had "fucked up" and "knows he did." After he left, Kelley went into Victim's room and found her dead. Unknown male DNA was found on Victim's body.

**{12}** Defendant argues it is only an assumption that, if an unknown stranger killed Victim, the stranger acted out of retaliation for Defendant's actions at the barbeque. Defendant's argument disregards the evidence, reviewed above, from which the jury could infer from the angry altercation, Defendant's ongoing threats, both close in time to the murder, together with Kelley's testimony that tied the unknown stranger to Defendant's actions. Defendant invited violence into Victim's home, endangering Victim when he engaged in violence, threatened Padilla and others at the barbeque, and continued his threats and preparations for further violence into the night.

**{13}** Our review of the record indicates that the identity of the person that Kelley claims entered the apartment and Victim's room is unknown. Nevertheless, this could lead a reasonable jury to conclude that Defendant's actions at the barbeque exposed Victim to an unsafe environment that resulted in her death. *See State v. Galindo*, 2018-NMSC-021, ¶ 12, 415 P.3d 494 ("The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (internal quotation marks and citation omitted)).

## C. Jessica Kelley

**{14}**   Finally, Defendant contends that there is insufficient evidence to show that he put Victim under the care of Kelley knowing that she was violent and or paranoid, and under the influence of meth. We disagree.

**{15}**   As previously mentioned, Kelley testified Defendant and she were smoking meth together in the apartment. Kelley testified that she grew "really scared" that morning and further stated she was "really paranoid because of the drugs." Kelley also testified that she was not in her right mind that morning and repeatedly told Defendant how paranoid she felt. She testified that Defendant was aware of her paranoia and stated that it was as if he was using her paranoia to upset her throughout the day.

**{16}**   Defendant and Mother came and went several times from the apartment, and Kelley continued to use meth. Around 10:00 a.m., Defendant spoke with Kelley and said he and Mother were going to his brother's house to pick up more meth. According to text messages introduced at trial, Victim was to be picked up that afternoon from the bus stop by Kelley. Instead, Victim found her own way home. Shortly after Defendant and Mother came home, Kelley testified that Defendant smoked meth in the bathroom.

**{17}**   Later, Defendant and Mother left to get cigarettes for Kelley. When they returned, Kelley was angry about the type of cigarettes they had purchased and was aggressive towards Mother. Around 7:00 p.m., Defendant and Mother left the apartment, again leaving Victim alone with Kelley and Defendant still under the influence of meth. Defendant and Mother did not return to the apartment until about 9:00 p.m., after Victim had been killed. Following the murder, Defendant was questioned by police and stated that he left Victim with Kelley and that he knew that Kelley was a violent person. Mother testified that though she made the decision, Defendant talked her into leaving Victim with Kelley that night.

**{18}**   Based on our review of the record, we conclude that there was sufficient evidence provided to show that Defendant created an unsafe environment for Victim, including putting Victim in Kelley's care. Defendant was willing to leave Victim alone with Kelley knowing that she was violent, paranoid and under the influence of meth. In addition, we note that it was Defendant who offered Kelley a room in Mother's apartment, just three days after Kelley's release from prison. *See State v. Cabezuela*, 2015-NMSC-016, ¶ 23, 350 P.3d 1145 ("We will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting our judgment for that of the jury." (alterations, internal quotation marks, and citation omitted)).

## II.    Jury Instruction

**{19}**   Although we acknowledge Defendant's contention that the jury instruction states that all the acts listed must "cumulatively" add up to guilt, rather than be found as alternative acts, his argument is irrelevant to our analysis. Therefore, we need not further address Defendant's contention regarding the jury instruction because there was

sufficient evidence to find Defendant guilty of *all* the acts listed to support the charge that he recklessly exposed Victim to an unsafe environment that resulted in her death.

**{20}**   Defendant next argues that the district court failed to provide a complete jury instruction because it did not instruct the jury regarding the meaning of "parental authority" with reference to the charge of reckless child abuse resulting in death of a child under the age of twelve. Some question exists about whether Defendant preserved this issue, but regardless of whether an error is preserved, "we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Notah*, 2022-NMCA-005, ¶ 23, 503 P.3d 418 (internal quotation marks and citation omitted). Because we determine no reasonable juror would have been confused or misdirected by the instruction, we need not delve into the preservation question.

**{21}**   At trial, and now on appeal, Defendant argues that UJI 14-622 NMRA should contain an element regarding "parental duty," or more specifically, "there must be an instruction [given] on *some* legal duty." Defendant argues that by not giving any instruction regarding the duty owed to a victim, the child abuse resulting in death statute is "unconstitutionally overbroad and vague" and leaves room to convict those who have no actual authority over the child being abused. We disagree.

**{22}**   Our Supreme Court's holding in *State v. Reed*, 2005-NMSC-031, 138 N.M. 365, 120 P.2d 447, directly responds to Defendant's contention. In that case, our Supreme Court rejected the notion that the Legislature intended that the "statute for negligent child abuse resulting in death is restricted to persons having a special relationship with the child, such as a parent or guardian." *Id.* ¶ 50 (referencing Section 30-6-1(D)). Defendant contends that *Reed* should not be interpreted "overbroadly" and argues that the holding in *Reed* "does not mean, however, that a defendant need not have *any* legal duty towards the child abused." Instead, Defendant contends that "the [S]tate must identify *some* legal duty on the part of [a] defendant." Defendant, however, cites no authority to support his contention that such a legal duty exists in cases such as this one. *See State v. Casares*, 2014-NMCA-024, ¶ 18, 318 P.3d 200 ("[A]bsent cited authority to support an argument, we assume no such authority exists."). The statute is aimed at protecting children, regardless of their relationship to an adult, in order to expand protection to children who are inherently more vulnerable than adults. *See Reed*, 2005-NMSC-031, ¶ 50 (citing *State v. Santillanes*, 2001-NMSC-018, ¶ 24, 130 N.M. 464, 27 P.3d 456 (referring to Section 30-6-1(C) (1989))). We do not agree that Defendant was convicted of "permitting" child abuse. The child abuse charged here was creating an environment that was unsafe and endangered Victim. That unsafe environment resulted in Victim's death. Accordingly, we find no error.

**{23}**   We note that the instruction given, without language regarding a duty owed by Defendant, did not likely confuse or misdirect the jury as to Defendant's duties to Victim. Defendant lived with Victim at the time of her murder, and was neither her parent nor guardian but more of a custodian. *See* NMSA 1978, § 32A-1-4(G) (2023) (defining "custodian" as "an adult with whom the child lives who is not a parent or guardian of the

child"). Further, Defendant was seen by the neighbors in the apartment complex taking care of Victim and her brother without Victim's mother present. We therefore reject Defendant's contention that there should be a "legal duty" definition included in this instruction when none was required and the jury was not misled about Defendant's relationship with Victim.

## III.    Double Jeopardy

**{24}**    Finally, Defendant argues on appeal that the six[1] counts against him for tampering with evidence should be reduced to two "conceptually separate crimes of tampering" with (1) cleaning the crime scene, and (2) disposing of one black sock in Mother's apartment. Defendant agrees that Jury Instruction No. 20 ("[D]efendant [tampered with evidence when he] hid and/or placed. . . one black sock in apartment 407 and one black sock in an orange laundry basket in [apartment] 808"), which accounts for Count 2, is sufficiently distinct from the other remaining counts, but argues Counts 3, 4, 5, 6, and 8 are not sufficiently distinct to be separate.

**{25}**    Defendant raises a "unit of prosecution" claim, asserting that he was unconstitutionally subjected to multiple punishments for the same crime for five of his six tampering convictions. *See State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61 (referring to double jeopardy-based claims challenging multiple convictions under a single statute as "unit of prosecution"). According to Defendant, at most, there is only evidence to support two tampering counts because they "would encompass one count for the acts related to attempts to clean the crime scene, and [the other] for the act of removing and disposing of a sock after fleeing to the neighbor's apartment." We disagree, concluding that Defendant's six convictions for tampering with evidence were supported by sufficient indicia of distinctness.

**{26}**    "A double jeopardy challenge is a constitutional question of law which we review de novo." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. With respect to tampering with evidence convictions, we apply the unit of prosecution analysis and examine whether a defendant has been improperly punished for "multiple violations of a single statute based on a single course of conduct." *Swafford v. State*, 1991-NMSC-043, ¶ 8, 112 N.M. 3, 810 P.2d 1223.

## A.  Unitary Conduct

**{27}**    "In our consideration of whether conduct is unitary, we have looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed." *Degraff*, 2006-NMSC-011, ¶ 27. "We have also looked for an event that intervened between the initial use of force and the acts that caused death." *Id.* For a defendant's conduct to not be unitary it must be "'separated by sufficient indicia of distinctness.'" *Id.* ¶ 35 (quoting *Swafford*, 1991-NMSC-043, ¶ 26). These indicia include "the timing, location, and sequencing of the acts, the existence of an intervening event,

---

[1]Defendant addresses Count 7. This count was vacated following his conviction, so we address Counts 3, 4, 5, 6, & 8.

the defendant's intent as evidenced by [their] conduct and utterances, and the number of victims." *Id.* (citing to *Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624).

**{28}** We address each count in turn.

## 1. The Counts

**{29}** We first address facts that support Count 4. According to neighbors, when Defendant and Mother returned to the apartment on the night of the murder, it appeared that they were both under the influence of drugs. Kelley told Defendant that Victim was dead. Defendant went into Victim's room, and, with Kelley's help, cut her limbs with a kitchen knife. Kelley testified that Defendant wrapped the limbs and then placed them in a clothes basket in Victim's room. The acts are sufficiently distinct for a number of reasons. First, Defendant's intent in mutilating Victim was to misdirect law enforcement from the scene because Defendant planned to place Victim's body "up on Sheree's road, up in the mesa." His intent was not to clean up, but to protect himself from the investigation that was certain to ensue. Second, it took Defendant several hours to finish this task. As a result, we conclude Count 4 is sufficiently distinct from the other acts so that no double jeopardy issue is present. *See Herron*, 1991-NMSC-012, ¶ 15 (discussing timing, location, sequencing, and intent).

**{30}** We next address facts underlying Counts 6, 8, 5, and 3. Kelley testified that two to three hours passed while Defendant mutilated Victim, washed his hands, and distracted Mother while she cleaned the carpet. Kelley testified that she wrapped Victim in a sheet and she and Defendant put Victim's body into the bathtub. Defendant placed the knives he used in the kitchen sink and washed them. Kelley explained the towels used to clean up the body were put into the washing machine, and further, Victim's clothes, soiled because of strangulation, were put into the trashcan underneath food that had been eaten earlier.

**{31}** Separate facts support the conduct identified in each count of tampering. *See State v. Silvas*, 2015-NMSC-006, ¶ 10, 343 P.3d 616 ("Conduct is unitary when not sufficiently separated by time or place, and the object and result or quality and nature of the acts cannot be distinguished."). Although Defendant's intent may have been the same regarding Counts 6, 8, 5, and 3, each act is distinct under *Herron. See Herron*, 1991-NMSC-012, ¶ 15. These acts took place over several hours. Victim's body parts were moved between different locations (the bathroom and Victim's bedroom), and Defendant committed multiple different acts: mutilation, facilitating cleaning the carpet, placing the body in the bathtub, cleaning knives, and putting Victim's clothes in the trash. The individual acts of disposal—cleaning knives and carpet, starting the laundry, throwing away clothes—involved separate acts putting different items in different locations. *See DeGraff*, 2006-NMSC-011, ¶¶ 36-39 (stating that where a defendant hid evidence at separate times and in separate locations, each act was distinct and therefore supported separate convictions for tampering with evidence).

**{32}** Defendant's acts were distinct from one another. *See State v. Sena*, 2020-NMSC-011, ¶ 46, 470 P.3d 227 ("Sufficient indicia of distinctness are present when the illegal acts are sufficiently separated by either time or space (in the sense of physical distance between the places where the acts occurred)." (alteration, internal quotation marks, and citation omitted)). Again, we conclude there is no double jeopardy violation here and that Count 4 is sufficiently distinct from the other acts, which are also distinct from each other, so that no double jeopardy issue is present. *See Herron*, 1991-NMSC-012, ¶ 15 (timing, location, sequencing, and intent).

**{33}** The following facts support Count 2. There were two white socks and one black sock found in the neighboring apartment, as well as another black sock found with Victim's limbs. Given the timing and the change in location, we determine no double jeopardy violation has occurred under these facts.

**{34}** Based on our review, Defendant's acts listed in Counts 3, 4, 5, 6, and 8 are not unitary. Accordingly, we conclude that there is no double jeopardy violation to justify reducing Defendant's six tampering convictions.

## IV.    Defendant's Remaining Arguments

**{35}** Defendant raises two additional arguments on appeal. He argues that his trial was fundamentally unfair and a miscarriage of justice and that there was cumulative error that warrants reversal of his convictions. Defendant has failed to present developed legal arguments regarding why his trial was fundamentally unfair and a miscarriage of justice apart from the assertion of jury instruction error, and we choose to not address it further. *See Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("To rule on an inadequately briefed issue, this Court would have to develop the arguments itself, effectively performing the part[y']s work for them."). Because we conclude that there is no error, we do not address Defendant's cumulative error argument. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328.

## CONCLUSION

**{36}** For the foregoing reasons, we affirm.

**{37}    IT IS SO ORDERED.**

**KRISTINA BOGARDUS, Judge**

**WE CONCUR:**

**JANE B. YOHALEM, Judge**

**KATHERINE A. WRAY, Judge**