# In the Iowa Supreme Court

No. 24–0845

Submitted March 25, 2026—Filed June 12, 2026

**State of Iowa,**

Appellee,

vs.

**Victoria Linda Nichole Gibbs,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, judge.

The defendant seeks further review from the court of appeals opinion affirming her conviction of child endangerment. **Decision of Court of Appeals and District Court Judgment Affirmed.**

Christensen, C.J., delivered the opinion of the court, in which McDonald, Oxley, McDermott, and May, JJ., joined. Mansfield, J., filed an opinion concurring in part and dissenting in part, in which Waterman, J., joined.

Webb L. Wassmer (argued) of Wassmer Law Office, PLC, Marion, for appellant.

Brenna Bird, Attorney General, and David Banta (argued), Assistant Attorney General, for appellee.

**Christensen, Chief Justice.**

### I. Introduction.

A mother was convicted of child endangerment after she left her three children alone at her apartment in Cedar Rapids while she drove with a friend to Burlington, a more than three-hour drive round trip. She appeals the sufficiency of the evidence. Because substantial evidence supports that the children's mother created a risk for them that was "clearly outside the range of risks that accompany ordinary life," *State v. Cole*, 3 N.W.3d 200, 207 (Iowa 2024), within the meaning of Iowa Code section 726.6(1)(*a*) (2021), we hereby affirm the decision of the court of appeals and the district court judgment.

### II. Facts and Procedural History.

On October 24, 2021, Victoria Gibbs went to Burlington with a friend named Cassandra Welch to help Welch retrieve some belongings. She left her Cedar Rapids apartment around 5 p.m., leaving her three children home alone. Gibbs's children were aged nine, seven, and four years old. The seven-year-old boy has significant special needs. He is nonverbal and requires a feeding tube. Before leaving the apartment, Gibbs changed his diaper, fed him, suctioned his nasal passages, and propped him up among pillows and blankets to watch the television in the downstairs level of the apartment.

Approximately three hours later, Cedar Rapids police officers were dispatched to Gibbs's apartment on a report that the children had been left alone for an extended period of time. When the officers arrived, they knocked on the door and announced their presence. One of the children could be heard locking the door and running upstairs. The officers then called the fire department to gain access to the apartment through the "KnoxBox" (master keys that are available on-site to allow the fire department to access an apartment in an

emergency). Before the fire department arrived, a woman the officers had previously observed in the apartment next door—Angel Wade—opened the door for them. Wade had apparently become aware of the officers' presence and accessed Gibbs's apartment through the back door.

Inside the apartment, the officers observed and photographed all three children. The seven-year-old was wedged in the pillows and blankets and had his feeding tube and suctioning equipment nearby. He was congested and had a wet cough. The officers observed him having coughing fits where he stopped breathing for about ten seconds. While they were in the apartment, both the officers and Wade wiped the seven-year-old's nose and mouth to take care of the congestion. The seven-year-old's diaper was also "saturated in urine." The nine-year-old and four-year-old siblings were upstairs. The nine-year-old was watching television in one bedroom, and the four-year-old was playing on a tablet in the other bedroom. The home was clean and organized, and the refrigerator had food in it. The nine-year-old had a cellphone, which he used to communicate with his mother.

The officers reached Gibbs on her cellphone at around 8:45 p.m., about forty-five minutes after their arrival on the scene. She became angry and abusive on the phone and said she was on her way back to the apartment. When she finally arrived a little after 10 p.m., she claimed that Wade was supposed to be watching the kids and that her "cousin" was also supposed to have come by. The police issued Gibbs a summons based on her promise to appear, and the Iowa Department of Health and Human Services (HHS) made arrangements to remove the children the next day.

A trial information was filed in the Linn County District Court charging Gibbs with one count of neglect of a dependent person, a class "C" felony, in

violation of Iowa Code section 726.3, and three counts of child endangerment, an aggravated misdemeanor, in violation of Iowa Code section 726.6. At the January 2024 trial, Gibbs presented a defense that Wade's paramour, Parris Armstrong, had been in the apartment watching the children all along. According to this version of events, Armstrong had skipped out the rear door of the apartment and switched places with Wade when the police arrived because he had an outstanding warrant. This version of events was supported by the trial testimony of Armstrong, Wade, and Welch. But it had many holes in it.

No one—not Gibbs, Armstrong, Wade, or Welch—had previously told police or HHS that Armstrong had been in the apartment. Gibbs had told the police that Wade was supposed to be watching the children, which Wade had denied once she realized the police had seen her in her own apartment. Also, neither Armstrong nor Wade knew how to operate the seven-year-old's feeding tube or suctioning machine, and Armstrong had never previously changed the seven-year-old's diaper.

Moreover, a series of texts between Gibbs and another friend named Camara Prime were introduced at trial and revealed Gibbs's actual plan for the children. At 4:54 p.m. on October 21, Gibbs texted Prime and asked her to go check on the children two to three times that evening. Thereafter, Gibbs and Prime exchanged texts, with Prime saying sometime after 6:28 p.m. that she was "about to head that way." Prime never got to Gibbs's apartment and, at 8:14 p.m., Gibbs tried to call Prime. When Prime did not pick up, Gibbs texted Prime saying that the police were at her home and asking Prime to call her back. The next day, Gibbs texted Prime that HHS was trying to take her children. At that point, she told Prime to say that she had shown up to watch them "and the police came so I sent [you] home."

The State highlighted the special needs of the seven-year-old and that he could not be left unattended. But the State also took the position that "leaving children of [ages four through nine] unattended for that many hours creates a substantial risk" in and of itself. The State pointed out that there was no need for Gibbs to have accompanied Welch to Burlington and leave her kids alone. It noted Welch's testimony that she was just picking up some boxes and tote bags, and there was "no reason" Welch could not have done this by herself, even though it went faster with two people.

The jury found Gibbs guilty on all four counts. A few weeks later, before Gibbs had been sentenced, we decided *Cole,* 3 N.W.3d 200. Relying on *Cole,* Gibbs moved for arrest of judgment on the child endangerment counts on the ground that she had not "create[d] a risk" for the children that was "clearly outside the risks of ordinary life" within the meaning of Iowa Code section 726.6(1)(*a*). *See Cole,* 3 N.W.3d at 207. *Cole* involved children aged five through twelve, including a child with autism, who had been left alone while the mother went to shop for the family at Walmart. *Id.*

The State resisted on the ground that *Cole* was distinguishable. It also argued for the first time that if something had happened to the seven-year-old while Gibbs was gone, the other two children could not have met his health needs, and this could have had an "immeasurable" emotional and mental effect on them—thus supporting the guilty verdicts on all counts.

The district court agreed that *Cole* was distinguishable and overruled Gibbs's motion. At sentencing, the State argued for incarceration while Gibbs, supported by the recommendation of the presentence investigation report, sought a deferred judgment on all counts. The district court gave Gibbs a deferred judgment on the felony neglect of a dependent person count and

imposed consecutive, suspended sentences with probation on the three aggravated misdemeanor counts of child endangerment.

Gibbs appealed the convictions on the child endangerment counts, urging that the evidence was insufficient per *Cole*. We transferred the case to the court of appeals, which affirmed the convictions. With respect to the seven-year-old with special needs, who required the use of a feeding tube and a suctioning machine, the court had "little trouble concluding the risk Gibbs knowingly or recklessly created" by leaving him alone with his siblings was "extraordinary" within the meaning of *Cole*. *See id.* Regarding the four-year-old, the court said that leaving any preschooler alone for five hours was enough to generate a fact question for the jury on extraordinary risk. Finally, with respect to the nine-year-old, the court said that he "raises perhaps a closer question." Yet, it adopted the State's theory that Gibbs created an extraordinary mental and emotional risk to the nine-year-old by "abandoning the children for some five hours, functionally leaving the nine-year-old responsible for all of them."

We granted Gibbs's application for further review.

**III. Standard of Review.**

We review Gibbs's challenge to the sufficiency of the evidence for correction of errors at law. *State v. Crawford,* 972 N.W.2d 189, 202 (Iowa 2022). "In conducting that review, we are highly deferential to the jury's verdict." *Id.* "The jury's verdict binds this court if the verdict is supported by substantial evidence." *Id.* (citing *State v. Tipton,* 897 N.W.2d 653, 692 (Iowa 2017)). "Substantial evidence is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "We view the evidence in the light most favorable to the State, 'including legitimate inferences and presumptions that

may fairly and reasonably be deduced from the record evidence.' " *Tipton*, 897 N.W.2d at 692 (quoting *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005)).

**IV. Analysis.**

Iowa Code section 726.6(1)(*a*) provides that a "parent . . . commits child endangerment when" she "[k]nowingly acts in a manner that creates a substantial risk to [her] child or minor's physical, mental or emotional health or safety." Gibbs challenges whether there was sufficient evidence that she had created a substantial risk[1] within the meaning of paragraph (*a*). As recounted above, we were recently presented with a similar challenge in *Cole*, 3 N.W.3d at 203–04. In that case, we determined there was insufficient evidence to support a conviction for child endangerment. *Id.* at 209. This time the scales tip the other way.

We begin by recounting the facts in *Cole*. There, a mother of six left five children unattended in her secured apartment while she went to Walmart with her infant daughter "to get diapers, toilet paper, and groceries." *Id.* at 201–02. An argument about leftover food caused one of the children, a nine-year-old girl, to leave the apartment and pace back and forth outside the door of the complex. *Id.* at 202. A neighbor who often assisted the mother with caring for her children, and had an "open door policy" when it came to them, helped the girl's worried ten-year-old brother call the police. *Id.* The officer who arrived at the scene confirmed: "[n]one of the children had actually run away," "[n]o child was lost," "[n]o child was crying," "[n]o child was bleeding," and "[n]o one was hurt at all." *Id.* at 203. The mother returned, with her groceries, twenty minutes after being contacted by the police. *Id.* The mother was charged and convicted by a jury of

---

[1]In *State v. Anspach*, 627 N.W.2d 227, 233 (Iowa 2001) (en banc), we interpreted "substantial risk" to mean "[t]he very real possibility of danger." We approvingly cited *Anspach* in *Cole*, 3 N.W.3d at 203.

child endangerment. *Id.* There, we held that the conviction was not supported by sufficient evidence. *Id.* at 209.

As we said in *Cole*, "A parent does not *create* a risk if that risk is part of the background risk of ordinary life." *Id.* at 205. We continued, "[A] risk is created by a parent when the parent's behavior produces an identifiable risk that falls outside the range of risks that accompany ordinary life." *Id.* An easy way to identify a parent-created risk, under *Cole*, is when the risk-causing conduct is "independently unlawful." *Id.* (emphasis omitted). Here, a jury determined that Gibbs's conduct constituted the class "C" felony of neglect of a dependent person in violation of Iowa Code section 726.3. Gibbs does not contest this conviction. Therefore, her conduct in leaving the seven-year-old unattended was independently unlawful. *See Cole*, 3 N.W.3d at 205.

The risks at issue in *Cole* also differed materially from the risks in this case. None of the children in *Cole* were as defenseless or as vulnerable as Gibbs's special needs seven-year-old. *See id.* at 202. Notably, the mother in *Cole* took the most vulnerable child, an infant, with her to Walmart. *Id.* Gibbs did not do the same. Instead, she left her medically fragile seven-year-old unsupervised despite knowing that he was congested and could suffer serious medical complications as a result.

The differences do not end with the children's relative vulnerability. The circumstances surrounding the mothers' absences in *Cole* and the present case also diverge sharply in both duration and distance. In *Cole,* the mother was gone approximately twenty minutes after being contacted by law enforcement. *Id.* at 203. Here, by contrast, Gibbs remained away for an hour and a half after officers intervened, five hours after her initial departure, making her return a lengthy round trip rather than a brief local errand. These facts materially

changed both the immediacy and magnitude of the risks faced by Gibbs's unsupervised children.

Gibbs's conviction with regard to the special needs seven-year-old, as the partial dissent agrees, was supported by sufficient evidence. Put simply, the child could not fend for himself. He required a feeding tube to eat, and someone had to clear his sinuses with a suction device when needed. On the day at issue, he had a cough, and his mother had to suction his sinuses to clear them before she left. Trial testimony highlighted the risk that the seven-year-old was in danger of choking to death on his own mucus. Text messages were also presented at trial that showed Gibbs was aware her children required supervision. Although she was unable to secure supervision, she chose to drive to Burlington anyway. If a medical emergency had arisen, the seven-year-old, who was incapable of requesting medical assistance on his own, would have been dependent on the vigilance of his four-year-old and nine-year-old siblings to save his life. By leaving such a medically fragile child at home unsupervised, Gibbs knowingly created a substantial risk to his physical well-being. All of these risks were created as a result of Gibbs's criminal neglect.

Gibbs's criminal neglect of her seven-year-old also created a substantial risk of emotional harm to his four-year-old and nine-year-old siblings. Had he experienced a serious medical emergency while left in their care, his young siblings would have been forced to witness—and potentially respond to—a traumatic event far beyond their age and abilities. Watching a sibling suffer a medical crisis or death is the type of experience that can leave lasting emotional scars on a child. Although no medical emergency ultimately occurred, the evidence shows there was a "very real possibility" one could have occurred. *State v. Anspach*, 627 N.W.2d 227, 233 (Iowa 2001) (en banc). That evidence is

sufficient to support a finding that Gibbs created a "substantial risk" to her four-year-old and nine-year-old children's "emotional health or safety." Iowa Code § 726.6(1)(*a*).

The concluding emphasis in *Cole* counseled against an expansive reading of its holding, highlighting many situations where leaving children unattended may constitute endangerment under section 726.6(1)(*a*). 3 N.W.3d at 209. Under our holding today, evidence that one child was placed at risk of death by the actions of the mother may provide sufficient evidence of a substantial risk of emotional harm for siblings also present in the domicile.

The risks in *Cole* were ordinary risks that children are routinely exposed to and entrusted to handle, such as leaving children in their own home while going grocery shopping and allowing a child to go outside in the middle of a summer day. *Id.* at 208. In contrast, Gibbs's criminal act of neglect *created* a risk not part of ordinary life—entrusting a four-year-old and a nine-year-old to navigate a stressful and potentially traumatic emergency for their medically fragile sibling. Therefore, the jury's conclusion that Gibbs was guilty of all three counts of child endangerment is an outcome substantially supported by the evidence.

**V. Conclusion.**

We are hesitant to unwind the judgments of "jurors representative of the community's common sense" and substitute our own as "appellate judges reviewing a cold record." *State v. Gibbs*, No. 24–0845, 2025 WL 2797246, at *4 (Iowa Ct. App. Oct. 1, 2025). Perhaps a jury selected from a community other than Linn County would have ended up with a different verdict, but we should not empanel ourselves to provide authoritative answers on matters of community values. Here, the evidence

is sufficient to support Gibbs's convictions on all three counts of child endangerment, and we will not vacate the jury's determination of guilt.

**Decision of Court of Appeals and District Court Judgment Affirmed.**

McDonald, Oxley, McDermott, and May, JJ., join this opinion. Mansfield, J., files an opinion concurring in part and dissenting in part, in which Waterman, J., joins.

**Mansfield, Justice (concurring in part and dissenting in part).**

I agree with the majority that the child endangerment verdicts as to the seven-year-old and the four-year-old were supported by substantial evidence. I dissent as to the nine-year-old. No evidence was presented that leaving this nine-year-old at home for several hours exposed him to an extraordinary risk of harm. *See State v. Cole*, 3 N.W.3d 200, 207 (Iowa 2026) (explaining that where a parent's behavior is neither independently unlawful nor overtly abusive, the parent must have engaged in behavior that creates an "extraordinary risk"). I would reverse that conviction.

## I. The Verdict as to the Nine-Year-Old Is Based on Speculation.

Leaving a typical nine-year-old at home for five hours does not create an extraordinary risk, for reasons we largely discussed in *State v. Cole. See id.* at 208 ("Nine-year-olds have long been trusted to walk to school without adult supervision."). What little evidence we have in the record shows that the nine-year-old was not in distress at all and was managing well until his mother returned. The State introduced a photo of him, taken right after the police entered the apartment. It shows him calmly watching television upstairs. Additionally, the nine-year-old had a phone on his person and was giving his mother telephonic updates once the police arrived outside the apartment. And the evidence also indicates that the nine-year-old was prepared to contact Angel Wade if he needed assistance and was ready to let Camara Prime into the apartment as soon as she arrived (which she never did).

The majority contends that if the seven-year-old had had a medical crisis, the nine-year-old could have been forced to witness and respond to this event. This in turn could have resulted in the nine-year-old suffering serious mental

and emotional harm. I would find such a chain of speculation insufficient to sustain a conviction under Iowa Code section 726.6(1)(*a*) (2021). "Evidence raising only 'suspicion, speculation, or conjecture is not substantial.'" *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017) (quoting *State v. Leckington*, 713 N.W.2d 218, 221 (Iowa 2006)). Based on the evidence presented, it is more likely that the nine-year-old would have called his mother or sought out Wade, who was right next door and let herself in through the back door when she realized the police had arrived. But in any event, we must engage in a further layer of speculation to conclude that this nine-year-old would have been traumatized. We know nothing about him apart from what I have related.[2]

Other jurisdictions have found the evidence insufficient to support criminal convictions for child endangerment based on mere speculation as to the potential for emotional or mental harm. *See, e.g.*, *State v. Pickett*, No. A18–1445, 2019 WL 2571800, at *3–4 (Minn. Ct. App. June 24, 2019) (reversing conviction for child endangerment in a case where a mother left her fourteen-year-old, eleven-year-old, and two-year-old alone, with the two-year-old locked into his bedroom from the outside, and noting that "[w]e might disapprove of EF's sleeping arrangements, but the record is not adequate to support a finding that

---

[2]The majority cites *State v. Anspach*, 627 N.W.2d 227, 233 (Iowa 2001) (en banc), for the proposition that it's not necessary that actual harm befall the child; "[t]he very real possibility of danger" is enough. (Alteration in original.) I agree with the majority, but it's useful to contrast the *Anspach* facts with the facts relating to the nine-year-old here. In *Anspach*, the defendant took the police on a chase, driving almost twenty miles an hour above the speed limit and making sharp turns in an attempt to elude them. *Id.* at 230. The pickup truck cab had four small children—aged one, two, two, and three. *Id.* The one-year-old lay on the floor of the truck, the two-year-olds were fastened together in one seat belt and the three year was completely unrestrained. *Id.* The children were upset and crying when police finally stopped the defendant. *Id.* at 234. We concluded, "If [the defendant] had gotten into an accident, which was a real possibility given his speeding, swerving, and attempts to elude police, these children could have been easily injured given their size and location in the truck." *Id.* In sum, *Anspach* involved a very real possibility of catastrophic harm to these small children; this case involves speculation as to the nine-year-old.

EF was in a situation likely to cause substantial harm to his mental or emotional health," "the state offered no expert evidence regarding mental or emotional harm to EF," and "the responding officer testified that when she saw EF he was not displaying any signs of emotional trauma"); *State v. Trujillo*, 53 P.3d 909, 913 (N.M. Ct. App. 2002) ("We recognize that there may be instances when the risk of emotional harm from a similar incident might be sufficient to support a conviction based on endangerment. In theory, the State might lay an adequate evidentiary foundation proving the likelihood of harm to a child's emotional health as a result of witnessing such an attack on her mother. We do not wish to foreclose such an evidentiary showing in the future. However, the State presented no such evidence in this case. The State also presented no evidence that Daughter was endangered merely by being left alone with Defendant's brother, unconscious on the couch. Accordingly, we determine that there was insufficient evidence of "a reasonable probability or possibility" that [the eight-year-old] Daughter's emotional or physical health was endangered." (citation omitted) (quoting *State v. Ungarten*, 856 P.2d 569, 571 (N.M. Ct. App. 1993), *abrogated by, State v. Chavez*, 211 P.3d 891 (N.M. 2009))); *City of Cleveland Heights v. Cohen*, 31 N.E.3d 695, 705 (Ohio Ct. App. 2015) (reversing a child endangerment conviction of a parent who engaged in domestic violence toward his spouse, explaining that it was not enough for the prosecution to prove that "the two children were present in the home at the time of the altercation, may have witnessed part of the dispute and may have been (understandably) upset or confused by their parents' words and actions").

By the majority's line of reasoning, *any time* a child with significant special needs is left alone with child siblings, there would be a multiplier effect in the number of criminal charges based on presumed mental and emotional injury to

the siblings. Such a multiplier effect based only on a presumption isn't what we meant by "extraordinary risk" in *Cole*. 3 N.W.3d at 207–08.

**II. The Majority Disregards *Cole*'s Emphasis on Extraordinary Risk.**

The majority reads *Cole* too selectively by omitting its discussion of extraordinary risk. Most parents agree that parenting is the hardest thing they have ever done. Parents make poor choices and commit errors of judgment all the time. That doesn't make them criminals. Because parents should not be sent to prison just because their parenting doesn't conform to "community values" (I disagree with the majority on this point), we explained in *Cole* that there is a high threshold for the state to overcome when the parent neither engages in independently unlawful behavior nor is overtly abusive. *Id.* at 206–07.

To illustrate that high threshold, we discussed *State v. Millsap*, 704 N.W.2d 426 (Iowa 2005), a case where we affirmed child endangerment verdicts even though the defendant's conduct was neither independently unlawful nor overtly abusive. *Cole*, 3 N.W.3d at 206–07. In that case, two boys, ages nine and ten, fell from the bed of a pickup truck the defendant had been driving. *Millsap*, 704 N.W.2d at 429. The bed was full of improperly loaded tree branches, and the children were sitting on top of the branches, trying to hold them down. *Id.* As the defendant drove the truck through town, a combination of wind and the momentum of the truck caused the branches—and the children atop them—to be hurled out of the truck. *Id.* The children landed on the concrete pavement, where they sustained fatal injuries. *Id.*

In upholding the defendant's child endangerment convictions, we concluded that the defendant had created a situation "more egregious than children simply riding in the back of a pickup." *Id.* at 431. Rather, the truck "only had a wooden plank across the end that provided little protection against

persons or branches falling or being blown out the back of the truck," and the defendant had placed the children "amidst improperly loaded tree limbs that had not been secured to the truck bed." *Id.*

As we later explained in *Cole*, "*Millsap* distinguished between *ordinarily* risky situations, like that of children 'simply riding in the back of a pickup' truck, and the *extraordinary* risk that a caregiver created by placing children 'amidst improperly loaded tree limbs' in a truck bed that lacked a proper tailgate." *Cole*, 3 N.W.3d at 207 (quoting *Millsap*, 704 N.W.2d at 431).

We reversed the jury verdict in *Cole* because no evidence suggested that the mother had "created any extraordinary risk." *Id.* at 207, 209. Today's majority disregards this aspect of *Cole*, although I hold out hope that it is still good law.

**III. The Majority's Reliance on the "Independently Unlawful" Rationale in *Cole* Betrays the Weakness of Its Position.**

Unwilling to maintain that the nine-year-old was exposed to an extraordinary risk, the majority instead argues that Victoria Gibbs's conduct was "independently unlawful." In particular, the majority notes that Gibbs was convicted of neglect or abandonment of a dependent person as to the seven-year-old, *see* Iowa Code § 726.3, in addition to child endangerment as to the seven-year-old, *see id.* § 726.6(1)(*a*).

But the neglect that violated Iowa Code section 726.3 was the same neglect that violated section 726.6(1)(*a*). There was no *independently unlawful* conduct like the drug use, reckless driving, and acts of assault that we discussed in *Cole*. *See* 3 N.W.3d at 205–07. In fact, the State conceded this point below: "The State does not disagree that Ms. Gibbs['s] behavior was neither independently unlawful or overtly abusive."

**IV. Conclusion.**

The majority's approach brings about the wrong kind of incentive. Here, Gibbs would have been in a better legal position if she had separated the nine-year-old from the other children before leaving town without any of them.

The majority does not contend that there was anything objectionable per se in leaving the nine-year-old alone for five hours; the issue is the speculative possibility that he would suffer mental and emotional harm because he was *with* the seven-year-old. If we are to engage in speculation, I would speculate otherwise. The nine-year-old had lived with his special-needs brother for the last seven years and had managed mentally and emotionally with his brother's frailty and vulnerability in the past as difficult situations had arisen. But in any event, speculation, whether it's mine or the majority's, is not enough.

For the foregoing reasons, I would reverse Gibbs's conviction and sentence with respect to count two.

Waterman, J., joins this concurrence in part and dissent in part.